2021 IL App (2d) 210228-U
No. 2-21-0228
Order filed September 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re D.G., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 19-JA-48 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Mary Linn Green, |
| Appellee v. V.D., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare was not against the manifest weight of the evidence. As such, and because respondent does not challenge the best-interest phase of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 2    In this case, respondent appeals the trial court's decision finding her unfit on all four counts

of the petition for termination of parental rights. For the reasons that follow, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4    Respondent is the biological mother of D.G., who was born on July 6, 2011. Her parental rights were terminated on April 29, 2021. D.G.'s putative father's rights were also terminated in the same proceedings but are not at issue in this appeal.[1]

¶ 5                         A.   THE NEGLECT PETITION

¶ 6    On February 5, 2019, the State file a three-count petition of neglect on behalf of eight-year-old D.G., alleging that he is a neglected minor and that his environment is injurious to his welfare because: respondent committed or allowed to be committed by her paramour a sex offense against the minor's sibling, S.B., thereby placing the minor at risk of harm (count 1); the minor and his sibling reside in a home where there is a history of domestic violence between respondent and her paramour, and the minor's sibling was struck in the head by a phone thrown by respondent's paramour causing injury to the minor's sibling, thereby placing the minor at risk of harm (count 2); and the minor and his sibling reside in a home where there is a history of domestic violence, thereby putting the minor at risk of harm (count 3).[2]

---

[1] The neglect petition was also brought against J.G., D.G.'s putative father. Because the parents were never married and legal paternity had not been established, the proceedings also included "the biological father of the minor who may be someone other than [J.G.]," referred to as "ALL WHOM IT MAY CONCERN." The putative father never appeared at any proceeding in this case, therefore, discussions and court rulings regarding him are not addressed in our disposition.

[2] A neglect petition was filed against respondent on behalf of S.B. as well and was heard simultaneously to the petition filed on behalf of D.G. At the request of S.B.'s biological father, the

¶ 7       This case originated when an intact family service case was opened by the Department of Children and Family Services (DCFS) on November 2, 2018, because of concerns regarding alleged sexual abuse of respondent's 15-year-old daughter, S.B., by respondent's then-paramour, M.B.  The family service plan, dated February 2, 2019, filed with the petition for neglect stated that a source reported that M.B. had inappropriately touched S.B.  The service plan stated further that respondent did not believe S.B.'s allegations, so respondent "kicked her out of [the] home."  S.B. moved to live with her biological father, I.B., and his paramour, M.R.  At some point soon thereafter, D.G. also left respondent's care to live with them.

¶ 8       On January 24, 2019, a report alleging inadequate supervision of D.G. was filed with DCFS against respondent.  M.R. and I.B. informed DCFS that they could no longer continue to care for D.G. and they requested DCFS find a placement for him.  M.R. and I.B. had made numerous attempts to contact respondent with no success.  Her whereabouts were unknown.  On February 2, 2019, DCFS took protective custody of D.G. and he was officially placed in the temporary care of M.R. and I.B.  The report indicated that respondent expressed that she wanted D.G. returned to her care, but she had no interest in having S.B. return because respondent did not believe S.B.'s allegations of abuse against M.B.  Respondent expressed that she did not understand why D.G. could not live with her. Respondent and M.B. had not been compliant in meeting with the social worker on a regular basis.  Respondent stated that she was unemployed, homeless, and currently living with friends.  Respondent had not provided DCFS with her current address.  The report noted that respondent had not engaged in any recommended services.

---

cases were severed at the November 12, 2019, hearing, and the cases proceeded separately thereafter.  The proceedings relating to S.B. will not be discussed in our disposition.

¶ 9    A shelter-care hearing on the petition for neglect was held on February 5, 2019. Respondent was found in default for failing to appear. The court found there was probable cause and an immediate and urgent necessity, despite the State's reasonable efforts, for removal of D.G. from respondent's care. Because of respondent's failure to appear and lack of cooperation with DCFS, the court ordered any visitation with respondent must be approved by DCFS. Lauren Schubert of the Court Appointed Special Advocates (CASA) was appointed as D.G.'s guardian *ad litem* (GAL).

¶ 10    Respondent appeared at the next status date on February 14, 2019, and explained to the court that she missed the hearing where she was found in default because she arrived at the courthouse too late. She informed the court that she was still homeless, was staying with friends, and had no source of income. She was appointed counsel and the matter was continued.

¶ 11                    B.    THE ADJUDICATION PROCEEDINGS

¶ 12    At the adjudication hearing on May 1, 2019, the parties presented a proposed agreement whereby the State would dismiss counts 1 and 2 of the neglect petition and respondent would stipulate that the State could prove the allegations in count 3 (minor residing in a home where there is a history of domestic violence), based on the original statement of facts filed with the petition. The court adopted the agreement of the parties and adjudicated D.G. a neglected minor as to count 3 of the petition and found that the "factual basis is the original Statement of Facts, which has been previously tendered to this Court."

¶ 13    The original statement of facts provided, in pertinent part, that respondent's 17-year-old daughter, J.R., reported that she left respondent's home in April 2018 because there was ongoing abuse, her mother failed to protect her and her siblings, and respondent's paramour at that time, M.G., kicked her out of the home. In the statement, J.R. explained that she moved in with her

boyfriend and his mother. She stated that M.G. drank daily and became aggressive and tried to hit her, her siblings, and respondent. She explained that they lived in a one-bedroom apartment at the time that "was not something people would want to live in." She, S.B., D.G., and respondent all slept on a king-size mattress on the floor and the place was infested with roaches and bed bugs. J.R. reported that respondent did not take care of herself, made threats to kill herself, and usually sold her LINK card benefits instead of using them to obtain food for the family. She stated that D.G. missed the first two weeks of school because he was not registered. D.G. did not attend school regularly because respondent would not wake up in time to get him ready and take him to school.

¶ 14    An altercation between respondent and her then-paramour, M.G., which occurred on March 8, 2018, was detailed in the statement of facts. Respondent said that M.G. had been drinking and taking drugs that day when he became angry with her. M.G. took S.B.'s phone and smashed it. He then hit respondent causing an injury above her eye which started to bleed. D.G., who was six years old at the time, saw the entire incident, including M.G. hitting respondent. J.R. came to the home to assist respondent. The police were called and M.G. was arrested and charged for the incident. A similar incident occurred January 9, 2018, when M.G. became angry and threw a phone at J.R. On November 11, 2018, D.G. reported that M.G. would kick him, punch him, and hit him, sometimes using a belt. He stated that he would have marks on his body as a result. Despite these incidents, the statement indicated that respondent denied needing any domestic violence services.

¶ 15    The statement of facts also indicated that D.G. has asthma and is supposed to use an inhaler daily. However, medical records showed that respondent had not been following D.G.'s treatment plan. The report also detailed an incident that occurred in May 2014 when D.G., then two years

old, left the home and wandered two blocks away where he was found by a concerned citizen alone and unsupervised. Respondent and her mother were home at the time and admitted that neither of them was supervising D.G. which is how he was able to leave the home without anyone noticing. The statement described an incident in September 2008 where an unidentified person (reporter) stated that respondent left her three children in reporter's care and gave her $20. The reporter was distressed because she had children of her own and was struggling to make ends meet. The reporter stated that respondent had a history of "meeting men and following them around the country." The reporter only had respondent's phone number. She believed respondent was in Oregon and did not know when respondent planned to come back to Illinois.

¶ 16    Upon adjudicating D.G. a neglected minor, the court moved directly to the dispositional proceedings. In accordance with further agreement of the parties, the court determined that "until further services are obtained, the parents are found either unfit or unable to appropriately care for, train or discipline the minor." However, the court stated that it could not find respondent unwilling to care for D.G. The parties agreed, and the court ordered, that DCFS would retain guardianship and custody of D.G. Respondent agreed further to cooperate with DCFS and participate in drug, alcohol, and psychological treatment and any other services required by DCFS. The parties agreed that visitation would remain at the discretion of DCFS. The matter was set for permanency review on October 29, 2019.

¶ 17                    C. THE PERMANENCY REVIEWS

¶ 18    After being continued, the first permanency review hearing was held on November 13, 2019. A permanency hearing report dated October 28, 2019, and an accompanying family service plan dated August 6, 2019, were submitted to the court.

¶ 19    The permanency hearing report noted that D.G. had been placed in a traditional foster home in July 2019 because M.R. had given notice that she and I.B. were no longer able to care for D.G. He was stable and doing well in his new foster home and had been more consistently attending counseling and school.  The report stated that respondent has not engaged in services; does not have stable housing; has not fully addressed her mental health problems; has not engaged in parenting classes; has not engaged in individual therapy; and continues to state that S.B. lied about any abuse at the hands of M.B., further asking DCFS to subject S.B. to a lie detector test. Regarding visitation, the report noted that respondent is allowed supervised visitation for one hour each week. Between June and October, respondent attended 10 out of 22 visits.  Respondent is required to call to confirm each visit with DCFS between 2 and 4 p.m. the day before.  On seven occasions, she failed to confirm and on two occasions she called to confirm, but she did not show up for the visit. Respondent explained that she could not confirm one visit because she did not wake up on time. She said she has sleeping issues where she falls asleep and cannot wake up. During the visits, respondent showed affection towards D.G., though she had to be redirected due to her crying and talking about the case during visits.  She also had to be redirected to only speak in English during the visit because the caseworker does not speak Spanish.  Respondent was reported to have brought healthy snacks for them during the visits.

¶ 20    Respondent had submitted to random drug tests and had tested negative for drugs. Respondent reported that she had been consistent with her case management appointments at Rosecrance, a substance abuse and mental health treatment facility, but the caseworker was unable to verify this with the facility.  Respondent was referred for a psychological evaluation, but it had not been completed because she had not engaged in services, completed substance abuse assessment or counseling, engaged in domestic violence services, or engaged in individual therapy.

The report concluded: "This needs to be addressed first prior to [respondent] being approved for a psychological [examination]."   Respondent stated that she is unable to work due to a disability resulting from being hit by a car in January or February of 2019.   Respondent said that the police and ambulance were not called to the accident.   There are no police records of any accident. Respondent did not have any documentation from a physician.   Respondent still reported having contact with M.B.   Her contact with the caseworker had been inconsistent, and she maintained that she saw no problem with her ability to parent or care for D.G.   The report concluded that her progress towards the goal of having D.G. returned home in 12 months was unsatisfactory and she was considered to not be making reasonable efforts.

¶ 21    At the hearing, the State argued that DCFS had made reasonable efforts and that placement of D.G. was necessary and appropriate.   The State argued further that respondent had not made reasonable efforts, because respondent had three no-calls and no-shows for visitation in one month. The State noted that this case was based on domestic violence concerns and the fact that respondent had not engaged in domestic violence services was significant in showing that she had not made reasonable efforts. The State recommended the permanency goal of return home within 12 months. Respondent's counsel argued that the court should find respondent had made reasonable efforts. Counsel explained that respondent takes "mental health medication, and it is something that she needs, and this causes her to oversleep at times" which is why she had missed visits.   Counsel further explained that respondent does not always have a working phone, which makes keeping contact with the caseworker difficult.   Respondent planned within days to set up her substance-abuse assessment. He stated further that respondent wanted to complete the services, but "part of the problem in regard to completing some of the services . . . is due to her lack of having any kind of a stable residence and these problems with her telephone."

¶ 22    The court found respondent had not made reasonable efforts for this review period.    The court decided to maintain the goal of return home within 12 months.

¶ 23    A second permanency review hearing was held on March 3, 2020.  The following were submitted to the court:  a permanency hearing report dated February 12, 2020, the accompanying family service plan dated February 4, 2020, and a CASA report prepared by the GAL dated March 3, 2020.

¶ 24    The permanency hearing report noted that respondent completed a mental-health assessment and was referred to a psychologist for treatment for depression and individual trauma-focused therapy due to her own neglect and abuse as a child.  However, respondent had not engaged in parenting classes, domestic violence services, or individual counseling.  Respondent said she signed up for counseling at Rosecrance, but "the person never showed up."  She was waiting to make another appointment. She had complied with random drug tests with negative results.  Regarding visitation, respondent was still under a plan of weekly one-hour supervised visits and was required to call to confirm.  Respondent had become more consistent in participating in visitation, but she had issues with providing appropriate nutritious snacks for D.G.  Respondent also spoke to the caseworker about being "interested in the same guy" as her daughter J.R. and that her daughter was jealous because he chose her. During this visit, respondent discussed her new paramour, asked D.G. if he wanted to talk to him, and texted him information about D.G., including taking a photo of D.G. with her phone and texting it to the paramour. Respondent was also observed to "fake cry" to get D.G. to give her something of his, such as a sweater, to take home with her. The caseworker admonished respondent that this was all inappropriate behavior.

¶ 25    The permanency report noted that respondent still had not secured a stable home or employment.  Respondent stated that a caseworker at Rosecrance was helping her find both and

that she was waiting to set up a meeting with the caseworker. She still complained of pain from the accident but there were no medical records or police report. The permanency report detailed respondent's recent living arrangements. She lived with her mother until her mother was evicted, but she did not allow the caseworkers to visit the home because of cleanliness and bug issues. Respondent stated that she was currently living with her cousin, F.R., and that she did not like living there because some of her items had been stolen from the home. She said she had applied for housing assistance and was waiting to hear back, but she provided no proof of this to the caseworker. The report indicated that on February 5, 2020, Felicia called the caseworker to inform her that respondent was no longer living with her. She explained that until recently, respondent had been seeing M.B. and he frequently would be at F.R's home. F.R did not like M.B. and asked that he not come to her home. More recently, respondent had been "talking to multiple guys" and had left F.R.'s home to stay with one for a week. F.R. told respondent to leave her house because respondent "did not clean, and 'lives like hell,' " left for a week, frequently had M.B. in the home despite F.R.'s disapproval, and was not doing what she needed to do to get D.G. back. Respondent called the police and asked them to tell F.R. to allow her to either stay in the home or leave her property there. F.R. reaffirmed that she wanted respondent to leave. Respondent then told her caseworker that "[F.R.] was making things up about her and was abusing her children and making [respondent] stay at home alone with [F.R.'s] children unsupervised despite her not being able to do."

¶ 26    The report concluded that respondent had not engaged in the assessments and services required to address the reasons the case was brought into care. Respondent had no stable housing, employment, or proof of disability to work, and she had not made sufficient progress toward the return home goal.

¶ 27    The CASA report stated that D.G. is well adjusted in his current foster home. His teacher had no concerns other than D.G.'s " 'off week' mentally" which was attributed to his visits with respondent. The foster parents indicated that it took D.G. a couple of days to re-adjust after visiting with respondent. Respondent had been difficult to reach and disclosed little to no information about how she is doing when asked. Respondent had not disclosed her current address, but she was reportedly living with her cousin. Her cousin planned to kick respondent out because she was uncomfortable with respondent's paramour, M.B., being around her children. CASA believed respondent was living with a new paramour but could not confirm. Respondent continued to move from place to place with no permanent residence, she did not have a vehicle, she did not work, and she did not engage in services. The report concluded that D.G.'s current placement was best for him.

¶ 28    The State again argued that respondent had not made reasonable efforts or progress because she had not engaged in services or complied with agency rules. Further, respondent was inappropriate during visits, referring to the incident where she sent a photo of D.G. to her new paramour, discussed the paramour with D.G., and asked D.G. to talk to him during the visit. Respondent's attorney argued that she had made reasonable efforts. Respondent had a mental-health assessment scheduled at Rosecrance and she intended to make that appointment and comply with any recommendations. She was not employed, but she was seeking disability benefits. Respondent told her attorney that she denied sending any photos of D.G. during a visit. She currently was residing with her mother, and she planned to contact the Rockford Housing Authority to inquire about obtaining housing.

¶ 29    The court determined that respondent had not made reasonable efforts or progress, but it maintained the goal of return home within 12 months.

¶ 30    A third permanency review hearing was held on June 9, 2020. A permanency hearing report dated May 26, 2020, and a CASA report prepared by the GAL dated June 8, 2020, were filed with the court.

¶ 31    The permanency hearing report stated that respondent had not fully engaged in the needed assessments, counseling, and other services to rectify the behaviors that brought the case into care. The report indicated that until she completes her assessments, she cannot be referred for additional services. Respondent had complied successfully with random drug tests. Respondent did not have stable housing, and the caseworker had been unable to assess any of the homes where respondent had been staying. Respondent stated that she was "kicked out" of F.R.'s house and was staying with a female friend whom she met at a bus station. Respondent remained unemployed. She said she was unable to work, she had applied for but been denied disability benefits, but she did not provide any evidence of these facts to the caseworker. Respondent had not completed a substance-abuse assessment, had not engaged in parenting classes, and had not engaged in domestic-violence classes. Respondent began a mental-health assessment, but she had not returned to complete the assessment.

¶ 32    All in-person supervised visitation was suspended due to the Covid-19 shelter in place order and was replaced with Zoom video calls supervised by caseworkers. The caseworker noted that respondent was difficult to reach, and her phone was often not working. The caseworker offered to assist respondent in getting a new phone or tablet, but respondent said she would resolve the issue. In mid-April, respondent contacted the caseworker and said she was unable to get a new phone and asked for assistance. DCFS assisted respondent in getting a tablet for video calls and respondent officially began video calls at the end of April. However, respondent missed video calls due to not responding, so the caseworker required respondent to call to confirm the day

before. The report indicated that when allowed, the one hour each week of supervised visitation would resume with precautions due to Covid-19.

¶ 33    The report concluded that respondent had not engaged in services or made reasonable efforts or progress toward the goal of reunification despite having ample time to do so, so the case was being referred for a legal screen. Respondent continued to have housing instability which prevented her from providing a safe environment for D.G. Respondent stated that she was unable to work and had reapplied for disability benefits, having been denied previously, but she did not provide any documentation.

¶ 34    The CASA report revealed that D.G. has a strong bond with his foster parents. D.G. experiences emotional highs and lows due to inconsistencies with visitation. Respondent had some communication with CASA, but overall, she was difficult to reach and disclosed little information when asked. On several occasions over the last year, respondent indicated that she had found a job and was going to start soon, but to CASA's knowledge respondent had never followed through or been employed. When she did communicate with CASA, respondent was very emotional, continued to express that there was no reason she should not have D.G., and stated that the only reason she did not have custody of D.G. was because S.B. lied about the abuse allegations. When CASA attempted to talk to respondent about the areas she needed to improve to potentially get D.G. back in her care, respondent became very emotional and defensive.

¶ 35    The State argued that respondent still had not made reasonable efforts or progress because she still had not engaged in services or completed the required assessments. The State asked for the goal to remain return home within 12 months, but for a review in four months to reassess and possibly change the goal. CASA agreed. Respondent's attorney argued that she had made reasonable efforts. Respondent's attorney informed the court that respondent was working on a

"homemaker's certificate" which she believed would help her obtain employment. She was working on getting an apartment, she was working on completing her mental-health assessment, and she had been more consistent with visitation. She understood that she must completed certain assessments as well as domestic-violence and parenting classes. Respondent's attorney had admonished respondent that she must complete these tasks and participate in services to prevent a permanency goal change by the next review. The court again, found respondent had not made sufficient reasonable efforts or reasonable progress, and continued the goal of return home withing 12 months for the rest of the review period.

¶ 36    A fourth permanency review hearing took place on October 1, 2020. A permanency hearing report dated September 23, 2020, the accompanying family service plan dated July 30, 2020, and a CASA report prepared by the GAL dated September 24, 2020, were submitted to the court.

¶ 37    The permanency hearing report indicated that respondent was living with Felicia again, but that respondent needed to move. On September 2, 2020, respondent reported that a friend was helping her find an apartment and she would be moving into her own residence, but she had not provided any further details. She had been referred for parenting classes but had not yet attended. She had not engaged in any domestic-violence services. Respondent had been referred for individual counseling but had not attended because she said she was on a waiting list. Respondent reported that she had been more consistently attending counseling at Rosecrance. However, the caseworker had not been provided any information about the type of counseling or any treatment plan. Respondent reported that she had completed the mental-health and substance-abuse assessments with Rosecrance, but no documentation had been provided to the caseworker. Respondent indicated a desire to find employment but stated that physical health problems make it difficult for her to work. Respondent was not receiving disability benefits.

¶ 38    The report indicated that in-person visitation had been reinstated, but respondent still had not progressed beyond once per week, one-hour supervised visits due to her inconsistency. Respondent was still required to call to confirm her visits the day before, and she had failed to confirm resulting in the cancellation of four visits. Respondent stated that she would forget to call and sometimes would call the caseworker between 7:30 and 8:15 p.m. explaining that she forgot to call earlier as required. The report indicated that respondent had a pattern of attending one visit and then missing the next two. When she did appear for visits, she was appropriate with D.G.

¶ 39    The CASA report stated that D.G. is a joyful child and is doing well with remote learning. His foster parents have rearranged their work schedules drastically to accommodate the remote learning schedule. The foster parents continue to express concern over D.G.'s visits with respondent. She frequently missed visits and when she did show up, there was little interaction. The foster parents recounted that this was difficult for D.G. They stated that D.G. is in counseling and working through some behavioral issues. CASA recommended that visitation continue to be supervised and that the frequency of visits be decreased due to inconsistency and emotional distress to D.G. CASA further recommended that D.G. remain in his current placement and that the court consider changing the permanency goal to termination of parental rights.

¶ 40    The State argued that respondent failed to make reasonable efforts or progress and recommended that the goal be changed to substitute care pending court determination on termination of parental rights. CASA agreed. Respondent's attorney argued that "while there have been some punctuality issues," respondent was having weekly visits and attended some counseling.

¶ 41    The trial court found that respondent had not made reasonable efforts or progress and that it was in D.G.'s best interest to change the goal to substitute care pending court determination of

termination of parental rights. The case was set for arraignment and pretrial on October 28, 2020, and an unfitness hearing on January 21, 2021.

¶ 42                    D. THE TERMINATION PROCEEDINGS

¶ 43    On October 5, 2020, the State filed a motion for the termination of parental rights with power to consent to adoption alleging that respondent was unfit because she: (1) failed to maintain a reasonable degree of interest, concern or responsibility as to D.G.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failed to protect D.G. from conditions within the environment injurious to his welfare (750 ILCS 50/1(d)(g) (West 2020)); (3) failed to make reasonable efforts to correct the conditions that caused the removal of the child during a nine-month period after D.G. was adjudicated a neglected or abused minor under section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) or dependent minor under section 2-4 of the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2020)); and (4) failed to make reasonable progress toward the return of the child to her during a nine-month period after D.G. was adjudicated a neglected or abused minor under section 2-4 of the Juvenile Court Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). The referenced time periods were May 1, 2019, to February 1, 2020, and January 1 to October 1, 2020. On October 29, 2020, respondent waived formal arraignment and the matter was continued.

¶ 44                         1. Unfitness Hearing

¶ 45    The unfitness phase of the proceedings to terminate respondent's parental rights commenced on January 21, 2021.

¶ 46    The State called Selena Martir, a foster care manager with Children's Home and Aid/DCFS, to testify. She testified that her responsibilities included meeting with families, coordinating service plans, guiding parents through the tasks they need to accomplish to achieve the permanency goal, working with foster parents, and making sure the minors receive any services

needed. Two integrated assessments were entered into evidence without objection: one approved on August 12, 2019, and one approved on February 4, 2019. Martir explained that integrated assessments present the family history and a detailed description of the individual's life and experiences. She testified that based on the assessments, respondent was required to find stable housing and income, engage in trauma-based individual counseling, and complete parenting education. She was also required to engage in visitation with D.G., demonstrate the skills she was learning through parenting education, and otherwise cooperate with the agency. Martir explained that a family service plan is created every six months to grade the parent's performance on the recommended services. The following family service plans were admitted into evidence: a plan dated August 6, 2019; a plan dated February 6, 2020; and a plan dated September 17, 2020.

¶ 47    Regarding respondent's progress, Martir testified that respondent did not complete counseling as required. She did not complete parenting education because she never completed or turned in any registration for the classes. She testified that respondent made no progress towards the goal of maintaining stable housing. Martir was outside one of respondent's previous residences but had never been inside any of her residences to determine the appropriateness of any place she had been living. Martir testified that respondent's visitation with D.G. had been inconsistent throughout the case. Because of this, respondent was required to call to confirm visits the day before, and she often failed to do so. During the most recent visit with D.G., Martir supervised and observed little interaction or conversation between the two. "They both seem to just kind of sit there in the presence of each other. There isn't a lot of conversation. More so [D.G.] engaged with games on [respondent's] phone than engaged in the actual visit." Respondent had never advanced beyond supervised visitation because of the lack of progress in developing parenting skills. When asked about the frequency and length of the visits between respondent and D.G., she

stated that they were two hours once a month. She explained that respondent's visitation had never been increased in frequency or duration because "we haven't seen the progress and efforts needed in order for us to continue to move them in a beneficial way for all parties." Respondent had the opportunity to attend doctor appointments with D.G. but never did so. She never inquired with Martir about DG's medical care or education. She did bring D.G. a gift for Christmas.

¶ 48 On cross-examination, Martir stated she was aware that respondent had difficulties with her phone and having an accurate number to reach her was a concern, but respondent did always have access to a phone to make the calls to confirm visitation. She acknowledged that there were concerns about respondent's cognitive ability and that a psychological exam was done in September 2019. A second psychological evaluation was requested to occur after she started individual counseling and parenting education, but because respondent never engaged in those services, the evaluation had not been completed. When asked whether anything inappropriate occurred during the visits between respondent and D.G., Martir described the incident where respondent tried to send her male friend a photo of D.G. and tried to have D.G. speak to him. She noted that respondent was redirected. That did not happen again, but respondent's phone did frequently ring during visits and respondent did talk about her male friends to the caseworkers.

¶ 49 The State then admitted the following exhibits without objection: two indicated packets; a certified petition for stalking and no contact order filed by respondent against J.Z., a former paramour of respondent, in August 2017; and the ROA (register of actions) for that stalking case. The court took judicial notice of the petition filed in this case, orders of adjudication and disposition, and all permanency review orders.

¶ 50 Respondent did not present any testimony or evidence.

¶ 51    The State argued that they had proven respondent's unfitness as a parent to D.G. by clear and convincing evidence as to all the counts in the petition.  Respondent was asked to complete certain services at a minimum to be reunited with her son, but she failed to do so.  She never progressed beyond the supervised visitation.  The State argued respondent's behavior and her pattern of choosing inappropriate partners had resulted in an environment that is potentially injurious to D.G. The State argued further that respondent had not made reasonable efforts and failed to make reasonable progress during the two nine-month periods outlined in the petition. Timothy Whitham, GAL from CASA, supported the State's position.

¶ 52    Respondent argued that the State failed to meet its burden of proof regarding her unfitness. She urged the court to find that she had demonstrated a reasonable degree of interest, concern, and responsibility as to D.G.'s welfare. In support, she stated that she had been participating in visitation with D.G., "although it was categorized as inconsistent at least at times." Regarding the injurious-environment allegations, she contended that the evidence presented constituted "things that predate this case being brought into Court and this minor being brought into care."  She acknowledged the problems with housing and income, but she argued that there was no testimony as to any services or assistance that the agency provided respondent to help her obtain secure housing or a secure source of income.  Respondent characterized her situation as being caught in a "circular trap" because her ability to progress beyond supervised visitation required her to complete parenting classes.  Before commencing parenting classes, she was required to complete paperwork which she claimed was difficult for her cognitively.  She could not get a second psychological evaluation to assess those deficits unless she started counseling and parenting classes.   She argued that the necessary services were not being provided by DCFS.

¶ 53    In rebuttal, the State argued that respondent had been offered services and was expected to participate in those services to the best of her ability and "at a minimum to demonstrate interest, concern, or responsibility for [D.G.]." The State argued that the fact that she did not do so is fully documented.

¶ 54    On April 29, 2021, the court rendered its decision, finding that the State met its burden of proving respondent unfit on all four counts alleged in the motion for termination of parental rights.

¶ 55    As to count 1, the court found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to D.G.'s welfare as demonstrated by the unsatisfactory progress reported in the service plans dated August 6, 2019, February 4, 2020, and September 17, 2020. The court noted that respondent never completed any of the services that she was asked to do; visitation was inconsistent throughout the case; visitation never progressed beyond supervised visits; and at times there was not much engagement with D.G. at visits. As to count 2, the court found respondent failed to protect D.G. from conditions within the environment injurious to his welfare. The court noted that respondent was indicated for inadequate supervision due to the May 11, 2014, incident, when D.G., then two years old, was unsupervised and found by a concerned citizen two blocks away from the home. Respondent was indicated for substantial risk of physical injury and an environment injurious to D.G.'s health and welfare, when D.G. was present when respondent's paramour, who was drinking and under the influence of drugs, smashed a cell phone and struck respondent in the head. As to counts 3 and 4, the court found respondent had made no reasonable efforts and no reasonable progress during the two nine-month periods. These findings were shown in the permanency reviews dated November 13, 2019, March 3, 2020, June 9, 2020, and October 1, 2020.

¶ 56                                2. Best-Interest Hearing

¶ 57    Upon finding respondent unfit, the court moved directly to the best-interest phase of the termination proceedings.

¶ 58    Mercedes Sanchez testified that, as a foster care supervisor for Children's Home and Aid/DCFS, she manages a team of five or six case workers and makes sure that all of the services are implemented for their cases, and ensure that they are meeting with the parents, foster parents, and children. In 2019 when this case was opened, she was the caseworker assigned to the case and in July 2020 when she was promoted to her new position, she supervised this case. Sanchez has observed D.G. in his current foster home where he is very bonded with his foster parents. D.G. laughs with them and expresses that he has fun with them. He looks to his foster parents for reassurance. D.G.'s foster parents encourage a relationship between D.G. and his older sister, S.B., whom D.G. sees every week. D.G. has reported to her that he feels safe and comfortable with his foster parents. Sanchez stated that "at the beginning of the case there was a little bit of concern with [the] minor's health in terms of having either asthma or diabetes, but with the consistent care and proper nutrition of the foster parents that they have provided to the minor, *** concerns have been eliminated since the minor has been placed with them in the home." D.G. is doing well in school, though there was a period of time when he struggled a bit with reading, his foster parents met with school officials to ensure that appropriate support was in place. The foster parents are willing to adopt D.G. Sanchez testified that she believed it was in D.G.'s best interest that respondent's parental rights be terminated and that D.G.'s foster parents be allowed to adopt him.

¶ 59    On cross-examination, Sanchez testified that D.G.'s visits with respondent had decreased to one hour per month. Sanchez noted that respondent's participation in visitation was very

inconsistent under the previous schedule of one hour per week. She stated that D.G. refers to respondent as mom.

¶ 60    The State asked the court to take judicial notice of the evidence and testimony from the fitness hearing, the court report dated April 29, 2021, submitted by DCFS, and the CASA report.

¶ 61    The GAL called J.G. to testify. J.G. is one of D.G.'s foster parents. He testified that D.G. has been in his home since August 2019. D.G. is in fourth grade and is doing well. D.G. has made friends and loves his foster parents' extended families. He described their families' reaction to D.G. as being "like a lost child coming home." D.G. enjoys his bike, trampoline, and X-box. J.G. stated that he and his partner are willing to adopt D.G. and ask the court to terminate the parental rights and change the goal to adoption. The court reviewed photos of D.G. and his foster family. J.G. stated that D.G.'s doctor reports that he is doing fine, and diabetes is not a concern at all.

¶ 62    On cross-examination, J.G. was asked whether they would allow D.G. to have any kind of contact with his biological family. J.G. stated that D.G.'s older sister, S.B., is "like a friend of the family and she's still a minor, so in my mind that relationship needs to be maintained. Outside of that, everybody else involved is an adult and we haven't heard from them, so I would rather not."

¶ 63    Respondent did not present any testimony or evidence.

¶ 64     After hearing argument of the parties, the court found that the State proved by a preponderance of the evidence that it was in D.G.'s best interest to terminate respondent's parental rights. In reaching this decision, the court stated that it "considered the statutory best interest factors as related to this minor's age and developmental stage, all of the evidence and considered arguments of counsel." The permanency goal was changed to adoption.

¶ 65    This appeal followed.

¶ 66                                  II. ANALYSIS

¶ 67     The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 68     In this case, the trial court found respondent unfit on all four grounds alleged in the motion for termination of parental rights. It is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds.

¶ 69     Count 1 of the motion for termination of parental rights alleged that respondent was unfit pursuant to section 1(D)(b) of the Adoption Act. That section provides that a parent may be found unfit for "failure to maintain a reasonable degree of interest, concern or responsibility as to the

child's welfare." 750 ILCS 50/1(D)(b) (West 2020). In determining whether a parent has maintained a reasonable degree of interest, concern, or responsibility as to the child's welfare "courts consider the parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1064 (2006). Completion of service plan requirements may be considered evidence of a parent's interest, concern, or responsibility. *Daphnie E.,* 368 Ill. App. 3d at 1065. Similarly, noncompliance with an imposed service plan, repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b). *In re Jaron Z.,* 348 Ill App. 3d 239, 259 (2004). In making these determinations, courts focus on the parent's efforts which show interest in the child's wellbeing, not whether those efforts were successful. *Daphnie E.,* 368 Ill. App. 3d at 1065. Circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *Syck*, 138 Ill. 2d at 278-79. However, a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *Jaron Z.,* 348 Ill App. 3d at 259. Rather, the degree of interest, concern, or responsibility must be objectively reasonable. *Daphnie E.,* 368 Ill. App. 3d at 1064.

¶ 70    Respondent argues that the trial court erred in focusing solely on her inconsistency in visitation as the reason for finding she failed to maintain a reasonable degree of interest, concern, or responsibility as to D.G.'s welfare. She argues that the court failed to consider that her conduct was the result of her circumstances and need to cope with other aspects of her life, including her unemployment, lack of stable housing, and issues with her phone. Respondent concludes that "the trial court needed to focus on Mother's efforts and not whether the efforts were successful."

¶ 71    Pointing to the respondent's unsatisfactory progress in the service plans dated August 6, 2019, February 4, 2020, and September 17, 2020, the trial court found respondent had not maintained a reasonable degree of interest, concern, or responsibility as to D.G.'s welfare. The court noted that respondent never completed any of the services that she was asked to do; visitation was inconsistent throughout the case; her visitation never progressed beyond supervised visits; and at times there was not much engagement with D.G. at visits. After reviewing the record, we conclude this decision was not against the manifest weight of the evidence.

¶ 72    The record shows that from the beginning of this case, respondent's degree of interest, concern, or responsibility as to D.G.'s welfare was problematic. Respondent's daughter, S.B. left respondent's home to live with I.B. and M.R. in November 2018 because of allegations of abuse at the hands of respondent's then-paramour. At some point thereafter, and for reasons unknown, D.G. left the respondent's care and moved in with I.B. and M.R. as well. When I.B. and M.R. could no longer care for D.G., their repeated efforts to contact respondent were unsuccessful and her whereabouts were unknown; thus, the neglect petition was filed.

¶ 73    When given the opportunity to engage in visitation with D.G., respondent's participation reflects a lack of reasonable degree of interest, concern, or responsibility for D.G.'s welfare. Respondent missed numerous visits throughout the pendency of this case. In fact, she had a pattern of showing up for one visit and then missing the following two. Respondent was required to confirm visits by calling the day before, and visits were cancelled on numerous occasions due to her failure to call to confirm. While respondent did have some problems with her phone, respondent also stated that when she did not call to confirm it was because she overslept and was unable to call or that she just forgot to call. Although respondent did show affection towards D.G. when she participated in visitation, the caseworker and GAL reported that, often there was little

interaction between D.G. and respondent during visits. Martir testified that she observed a visit and "They both seem to just kind of sit there in the presence of each other. There isn't a lot of conversation. More so [D.G.] engaged with games on [respondent's] phone than engaged in the actual visit." Certain inappropriate behavior was observed during the visits as well, including the incident where respondent communicated with her new paramour about D.G. during the visit, sent him a photo of D.G., and asked D.G. to talk to him. During another visit, respondent was observed to "fake cry" in an effort to get D.G. to give her a personal item, namely his sweater, to take home with her.

¶ 74     Furthermore, respondent's failure to comply with the service plans by failing to pursue any of the services or activities necessary to allow her to expand her visitation with D.G. reveals a lack of interest, concern, or responsibility as to D.G.'s welfare. Most notably, respondent did not engage in *any* domestic-violence counseling or parenting-education classes. Respondent was also required to find stable housing and employment in accordance with the service plans. Respondent acknowledges in her brief, that her lack of a stable residence made it impossible for her to progress to overnight visitation. However, in the 17 months between her adjudication of neglect and the last permanency hearing (May 1, 2019, to October 1, 2020), respondent did not secure stable housing or employment. Respondent argues that the court should have considered her efforts in these endeavors, and not her success.

¶ 75     The record reveals that respondent was admonished that she needed to improve her parenting skills and participate in services to protect herself and D.G. from domestic violence. Despite being given ample opportunity and numerous admonishments about the importance of completing these services, respondent failed to do so. Martir, the foster care manager, testified because of respondent's failure to engage in services and her lack of progress in developing

parenting skills, her visitation schedule never advanced beyond one hour of supervised visitation each week. Respondent did not complete any domestic-violence assessment or counseling. This is notable because of the history of domestic violence at the hands of respondent's paramours. Martir also testified that respondent did not complete the counseling required and she did not complete parenting education because she never registered for the class. In fact, respondent reportedly stated that she did not understand why D.G. could not live with her and she saw nothing wrong with her ability to parent and care for D.G. At one point, she stated that the only reason she did not have custody of D.G. was because S.B. lied about the abuse allegations. Respondent's complete lack of insight and effort regarding the services necessary to improving her parenting skills supports the trial court's conclusion that she failed to maintain a reasonable degree of interest, concern, or responsibility for D.G.'s welfare.

¶ 76    To progress beyond supervised visitation to overnight visitation with D.G., respondent was aware that she was required to secure stable housing. The record reveals that throughout this case, respondent exhibited a lack of effort to do so. When the case was filed, she was living with her mother in an apartment that respondent, herself, stated was not suitable due to bug infestation and cleanliness issues, and she had to move out when her mother was evicted. Thereafter, the reports show that respondent would often not share her current address with the caseworker. She was known to have lived for periods of time with her cousin and a friend she met at a bus station, but the caseworker was never allowed to see these residences to determine if they were suitable homes for D.G. Although in the February 2020 permanency hearing report, respondent stated that her counselor at Rosecrance was helping her find housing, and that respondent was waiting to set up a meeting, still by the last permanency hearing in October 2020, respondent was reportedly living back with her cousin (and needing to move out). Respondent's lack of effort and attention to the

importance of finding a stable place to live in the 20 months after the neglect petition was filed in February 2019 underscores a lack of concern or responsibility for D.G.'s welfare.

¶ 77    Similarly, respondent failed to secure a source of income which would have shown an interest in being responsible for D.G.'s care.  Respondent stated on numerous occasions that she was working on finding a job, or had a job lined up and was waiting to start.  However, she remained unemployed at every permanency review.  Although respondent claimed that she suffers from a disability resulting from an accident that occurred in January or February 2019, there were no medical records or a police report presented to the caseworker to support her claim. She stated that she applied for disability benefits, was denied, and had reapplied, but she provided the caseworker with no documentation of these efforts.  Respondent's disinterest in securing income to support D.G. further reveals a lack of interest, concern, or responsibility for his welfare.

¶ 78    Additional evidence of respondent's lack of interest in D.G.'s welfare was presented when Martir also testified that respondent had the opportunity to attend D.G.'s doctor appointments, but never did so.  She also never expressed concern for D.G.'s wellbeing by inquiring about his medical care or education.

¶ 79    In support of her challenge to the trial court's finding of unfitness as to count 1, respondent submits that the State violated section 2-10(2) of the Juvenile Court Act by failing to file an amended visitation plan when respondent's visitation was changed from a one-hour supervised visit each week to a two-hour supervised visit once each month. See 705 ILCS 405/2-10(2) (West 2020) (providing that DCFS may change visitation without seeking amendment of the visitation plan under certain circumstances, but DCFS must serve the parties and file with the court any amendments to the plan within 10 days of the change in visitation).

¶ 80     First, we note that respondent makes no argument and cites no authority to explain how this omission is relevant to the trial court's decision on count 1.  Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires the appellant's brief to include an argument section "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."  As a reviewing court, we are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *Walters v. Rodriguez,* 2011 IL App (1st) 103488, ¶ 5. Arguments that are not supported with citations to relevant authority fail to meet the requirements of Rule 341(h)(7) and are forfeited. Furthermore, respondent raises this contention for the first time here on appeal.  Issues not raised in the trial court are forfeited and may not be raised for the first time on appeal. *Gorman-Dahm v. BMO Harris Bank, N.A.,* 2018 IL App (2d) 170082, ¶ 44.

¶ 81     Forfeiture notwithstanding, the State's failure to file an amended visitation plan had no impact on respondent's ability to comply with visitation or otherwise maintain a reasonable degree of interest, concern, or responsibility for D.G. As the record shows, the visitation plan whereby respondent was granted one hour of visitation each week with D.G. was implemented on February 22, 2019.  That visitation plan remained in effect at least until the fourth and final permanency hearing which occurred on October 1, 2020.  Although the date that the visitation plan was changed is not specified in the record, it is clear from the record that this change occurred some time after the permanency goal changed from return home within 12 months to substitute care pending court determination of termination of parental rights.  We note that Martir testified at the unfitness hearing on January 21, 2021, that visitation was two hours once a month.  Sanchez, who supervised visits and testified at the best interest hearing that same day, stated that "because of the goal being subcare we are in the process of terminating her rights, the visits have decreased to one hour per

month." Neither the change in visitation nor this discrepancy in testimony has any bearing on the fact that respondent was under the same visitation plan for at least 19 months. We conclude that the change in the visitation plan *after* the goal was changed to substitute care pending termination of parental rights in no way hindered respondent's ability to maintain a reasonable degree of interest, concern or responsibility as to the D.G.'s welfare during the pendency of this case. See *In re Kenneth F.*, 332 Ill. App. 3d 674, 679-80 (2002) ("An error that prejudices no one should not prevent children, who are the objects of these proceedings, from attaining some level of stability in their lives.").

¶ 82    In sum, we cannot say that the trial court's determination that respondent was unfit as to count 1 because she failed to maintain a reasonable degree of interest, concern, or responsibility as to D.G.'s welfare was unreasonable, arbitrary or not based on the evidence. Having determined that the trial court's decision on this ground of unfitness is not contrary to the manifest weight of the evidence, we need not consider whether respondent is also unfit on the other grounds found by the trial court. As such, and because respondent did not appeal the trial court's decision that it was in the minor's best interest that respondent's parental rights be terminated, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 83                                III. CONCLUSION

¶ 84    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 85    Affirmed.