# Illinois Official Reports

## Appellate Court

---

### *In re N.B.*, 2019 IL App (2d) 180797

---

| | |
|---|---|
| Appellate Court Caption | *In re* N.B., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Andre B., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-18-0797 |
| Filed | February 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 18-JA-39; the Hon. Mary L. Green, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Andrew J. Vella, of Rockford, for appellant.<br><br>Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, Andre B., appeals the circuit court of Winnebago County's orders finding that he was unfit as N.B.'s parent and that it was in N.B.'s best interest to terminate respondent's parental rights. We affirm.

¶ 2                               I. BACKGROUND

¶ 3     Mary W. gave birth to N.B. on January 26, 2018. Shortly thereafter, the Department of Children and Family Services (DCFS) received a "hotline" call reporting that Mary was incapable of caring for a child due to her diagnoses of "mental retardation,"[1] post-traumatic stress disorder (PTSD), borderline personality disorder, and bipolar disorder. On January 30, 2018, following an initial investigation, DCFS took protective custody of N.B. Charles Ward, a DCFS caseworker, later testified at the hearing in this case that he interviewed Mary at the hospital. Mary had difficulty understanding and answering questions, and she did not appear to understand the meaning of prenatal care. She told Ward that a previous child of hers had been removed from her care because people thought she was mentally retarded. She said that she had an adult guardian and that she lived with respondent. DCFS was familiar with respondent from previous cases where his children were removed from his care.

¶ 4     On February 1, 2018, the State filed its original neglect petition. As to respondent, the State alleged that N.B. was a neglected minor, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2016)), for three reasons: (1) respondent failed to cure the conditions for which N.B.'s minor siblings were in the care of DCFS, (2) respondent had a history of domestic violence, and (3) respondent had ongoing substance abuse problems that prevented him from properly parenting.[2] The State requested that the court terminate respondent's parental rights and appoint DCFS as legal guardian with the power to consent to adoption, alleging that respondent was unfit in that he was a depraved person, pursuant to section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2016)), and that it was in N.B.'s best interests to terminate respondent's parental rights. Respondent waived his right to a shelter-care hearing, and the State proceeded on a second amended petition. A combined hearing pursuant to section 2-21(5) of the Act was held to adjudicate neglect, determine unfitness, and decide whether it was in N.B.'s best interest to terminate respondent's parental rights. 705 ILCS 405/2-21(5) (West 2016).

¶ 5     The combined hearing took place over five dates between June 22, 2018, and September 26, 2018. During the first stage of the hearing, which took place over the first four dates, the court heard evidence relating to neglect and unfitness. Quinton Ponius, a DCFS investigator, testified that he interviewed Mary at her home. Ponius testified that he "indicated"[3] Mary as

---

[1] The record indicates that Mary was diagnosed with "mental retardation." We recognize that the more contemporary term "intellectual disability" is also used to describe the condition. See *Hall v. Florida*, 572 U.S. ___, ___, 134 S. Ct. 1986, 1990 (2014).

[2] The petition also contained allegations relating to Mary's unfitness, but Mary ultimately surrendered her parental rights, and those allegations are not germane to this appeal.

[3] "Indicated" is a term of art codified in the Illinois Administrative Code. It refers to any report where it is determined, after an investigation, that credible evidence of the alleged abuse or neglect

being unable to care for N.B., based in part on her failure to correct previous issues identified by DCFS and in part on her inability to answer basic care questions, such as how to feed the baby or change his diaper. Ponius testified: "She was just not coherent enough to care for this child at all."

¶ 6 Ponius also testified that he "indicated" respondent as being unable to care for N.B. He testified that respondent's parental rights had been terminated as to several of his other children after he was "indicated" in at least five complaints of domestic violence, substance abuse, and unsafe environmental conditions between March 2013 and August 2014. Three of respondent's children, E.B., H.B., and D.B., were adjudicated neglected following their removal from his care in 2013. As to E.B., respondent was found to be unfit and his parental rights were terminated. As to H.B. and D.B., he signed irrevocable consents for adoption, and the court made no findings as to unfitness or best interest.

¶ 7 Ponius further detailed his investigation in a report admitted as a business record. In the report, Ponius documented his interview with Tamera Robinson, Mary's court-appointed guardian. Robinson reported that respondent had a history of domestic violence and substance abuse. Additionally, Mary disclosed to Robinson that respondent had "pimped her out in different situations" and left her stranded with no way to get home. When talking about this subject, Mary would get visibly upset and yell.

¶ 8 Angela P. testified at the neglect-and-unfitness stage of the combined hearing that she had an 11-year relationship with respondent that ended in 2014. Angela and respondent had three children together, E.B., H.B., and D.B. Angela said that, during most of the relationship, respondent would drink "almost" 30 beers every day. She revealed that he was physically violent and verbally abusive toward her and the children during his daily periods of intoxication. He would hit her in the head, punch her in the face, rip out her hair, and force her to have sexual relations. He constantly degraded her by telling her that she was stupid, that no one would love her, and that the children would be better off if she were dead. Angela testified that she tried to leave him several times but that each time he caught up to her, severely beat her to the point of unconsciousness, and threatened to kill her if she tried again.

¶ 9 Angela also described respondent's abusive behavior toward their children. He directed most of his physical violence toward E.B., who suffered from autism, attention deficit hyperactivity disorder, and bipolar disorder. Angela testified that, beginning when E.B. was three or four years old, respondent would hit E.B. daily, saying that he was going to "beat the special needs out of him." Respondent used his fist, his open hand, and a belt to hit E.B. on his face, back, stomach, chest, and the back of his head. When she tried to intervene, respondent would lock her out of the house. On several occasions, E.B.'s younger sister, H.B., who was about five years old, tried to protect her brother. Respondent hit H.B. in the face until he bloodied her nose. Angela said that respondent would lock E.B. in his room for an entire day "a couple of times a week." When respondent discovered her trying to sneak food to E.B., he punched her in the head and kicked her in the stomach. This daily violence continued for about five years, until DCFS removed the children from the home.

exists. "Unfounded," on the other hand, refers to any report where it is determined that no credible evidence of the alleged abuse or neglect exists. 89 Ill. Adm. Code 300.20 (2018).

¶ 10    Angela revealed that when she was six or seven months pregnant with their youngest child, D.B., respondent began beating her face and punching and kicking her stomach, saying that he wished the baby would die.

¶ 11    Angela further testified that, although the majority of the physical abuse toward the children centered on E.B., respondent verbally abused all of the children almost daily, "screaming at them, constantly calling them stupid, worthless." She said that his verbal abuse was triggered when they would sit in the wrong place or not "grab him a beer quick enough." DCFS removed the children in 2013, following a series of reports, the last of which ended with a building inspector condemning their home.

¶ 12    Angela related that De. B., respondent's 15-year-old daughter from a previous relationship, was living in their home on August 3, 2014. Angela described a scene where an intoxicated respondent became angry that De. B. was on the telephone. He chased De. B. around the house, punching and hitting her in the head, shoulder, and chest. Angela grew concerned that he might kill De. B. Angela tried to intervene, but respondent punched her in the head before turning his attention back to De. B. At some point during the melee, De. B. managed to phone the police. Respondent was arrested and pleaded guilty to domestic battery, a Class A misdemeanor (720 ILCS 5/12-3.2(a)(2) (West 2014)). Respondent remained in the Winnebago County jail for 37 days before being sentenced to 24 months of probation.

¶ 13    Angela acknowledged that it was respondent's period of incarceration that gave her the courage to seek an order of protection, which the court granted. She testified that she later filed multiple police reports of violations of the order of protection. She claimed that on several occasions she was contacted by respondent "himself or through [a] third party contacting [her] through social media or other means." She also reported that a utility account was opened in her name at an address where respondent was living and where she had never lived.

¶ 14    Kendra Try also testified at the neglect-and-unfitness stage. She served as respondent's probation officer beginning in October 2015. The court twice revoked respondent's probation for various violations, including failure to abstain from the use of alcohol and illegal drugs, failure to complete partner-abuse intervention programming, failure to complete substance abuse treatment, and failure to complete mental health treatment. Try indicated that, on four separate occasions, respondent tested positive for either cocaine or alcohol. Additionally, he failed to report for a scheduled office visit and had a "few different arrests during his supervision of probation."

¶ 15    The court admitted certain sworn and certified documents relating to a petition for an order of protection filed by Wendy S. This evidence showed that Wendy was respondent's new paramour as of July 2015 and that he was living with her at that time. Wendy is blind and relies on a cane to aid in her mobility. On July 12, 2015, Rockford police arrested respondent, and he was indicted on two counts of felony battery against Wendy. On July 13, 2015, Wendy petitioned the court for an order of protection. In her petition, she described respondent's three-day drinking binge during which he physically attacked and verbally maligned her. He struck her in her neck and back. He hurt her hand to the point that it had no feeling and she could no longer write. He called her various disparaging and profane names and told her that he would hit, stab, and kill her. In his final physical attack during this period, he headbutted and punched her in a hallway before dragging her into the living room. He then suffocated Wendy by pressing a pillow over her face until she passed out. Respondent pleaded guilty to domestic battery that causes bodily harm (720 ILCS 5/12-3.2(a)(1) (West 2014)). He was ordered to

have no further contact with Wendy or the residence where they lived and to abstain from the use of alcohol and drugs.

¶ 16 Respondent was again arrested months later for domestic battery against Wendy. Vincent Rhine testified during the neglect-and-unfitness stage of the hearing that he was a patrol officer with the Rockford Police Department in June 2016. On June 3, 2016, he responded to a 911 report of domestic violence at the residence that respondent had shared with Wendy. He testified that he first made contact with Wendy, who was upset and crying. Rhine took a photograph of Wendy to document her injuries, which the court admitted into evidence. Rhine testified that respondent had initially left the scene but that he returned while Rhine was still present. Rhine testified that respondent's eyes were blurry and bloodshot and that he was "a little off balance." Rhine arrested respondent at the scene. Based on the new charges, the State petitioned to revoke respondent's probation in the 2015 domestic battery case, accusing him of violating the terms of his probation by (1) violating a criminal statute, (2) having contact with Wendy, (3) being present at the residence, and (4) consuming alcohol. On July 26, 2016, respondent admitted to violating the terms of his probation as outlined in the petition.

¶ 17 Brendan Mather, a patrol officer with the Rockford Police Department, also testified during the neglect-and-unfitness stage. On August 12, 2017, he responded to a report of an intoxicated male making suicidal statements and attempting to jump into the Rock River in Rockford. Mather made contact with that person, who turned out to be respondent. Mather observed two men in an area of dense brush and trees trying to pull respondent away from the shoreline. With the help of those men and another officer, and while respondent was attempting to break free to make it into the river, Mather eventually pulled him up the steep shoreline and out of danger. Mather testified that he detected a "heavy" odor of alcohol on respondent's breath and clothing. Respondent told Mather that he had no reason to live. Mather transported him to Rockford Memorial Hospital and placed him on hold for an involuntary psychological evaluation and an outstanding felony warrant in Wisconsin.

¶ 18 Respondent presented no evidence during the neglect-and-unfitness stage of the combined hearing.

¶ 19 On September 26, 2018, the court delivered its ruling on neglect and unfitness as to respondent. It found that the State had proven by a preponderance of the evidence that N.B. was neglected on three counts: (1) respondent failed to cure the conditions of an injurious environment, (2) respondent had a history of domestic violence, and (3) respondent had current substance abuse issues. The court then turned to the question of unfitness and found by clear and convincing evidence that respondent was unfit, citing "a series of acts and a course of conduct that indicate[d] a moral deficiency." It noted that the evidence of substance abuse and domestic violence was "quite compelling," specifically pointing to Angela's "credible" testimony outlining the turbulent history of her 11-year relationship with respondent. The court further cited respondent's convictions of domestic violence, his violations of probation orders, his inability to remain free of drugs and alcohol, and his failure to engage in treatment for domestic violence. As to the environmental neglect, the court recounted that N.B.'s proposed environment at respondent's home was "appalling," noting testimony that there were "bed bugs crawling off of things as well as other vermin and filth."

¶ 20 After adjudicating N.B. neglected and finding respondent unfit, the court immediately turned to the best-interest stage of the combined hearing and took judicial notice of the previous proceedings.

¶ 21    Steven Jackson, the DCFS caseworker for N.B., testified at the best-interest stage that DCFS conducted an integrated assessment of respondent in February 2018 and that respondent had completed none of the recommended services. Jackson stated that it was not in N.B.'s best interest to be returned to respondent, due to respondent's failure to complete services and the environmental conditions of respondent's home. Jackson testified that N.B.'s foster parent provided a nurturing and caring environment. N.B. was only a few days old when his foster parent began caring for him, and N.B. had developed bonds with her, her extended family, and the community, through her church. Jackson testified that he believed that it was in N.B.'s best interest that his foster parent adopt him. No other evidence was presented at the best-interest stage.

¶ 22    In reaching its decision, the court stated that it considered the statutory best-interest factors as they related to N.B.'s age and developmental stage, the evidence, and the parties' arguments. It noted that respondent had failed to complete any services and would not be in a position in the foreseeable future to have N.B. returned to him. On the other hand, compelling evidence indicated that N.B. was well cared for in his foster home. He had lived in the same home since he was a few days old and had bonded with his foster parent as well as her extended family. His foster parent was attending to his special medical needs. Accordingly, the court found that it was in the best interests of N.B. and the public to terminate respondent's parental rights, and the court appointed DCFS as legal guardian with the power to consent to adoption. Respondent timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    Respondent argues that the court's finding that he was unfit was against the manifest weight of the evidence and that the finding that it was in N.B.'s best interest to terminate respondent's parental rights was an abuse of discretion. Respondent does not challenge the court's adjudication of neglect. The State maintains that there was ample evidence to support each of the court's findings.

¶ 25    In Illinois, following an adjudication of abuse, neglect, or dependency under an original petition, proceedings to terminate parental rights usually proceed under a separate petition in two additional steps. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. First, the court must determine whether the parent is unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Then, if the court finds unfitness, the proceedings move to a best-interest hearing, where the court must determine whether it is in the best interest of the child to terminate the parent's parental rights. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 26    Section 2-21(5) of the Act permits a trial court to combine these separate hearings and terminate parental rights at the initial dispositional hearing when the original or amended petition contains a request to terminate parental rights and appoint a legal guardian with the power to consent to adoption.[4] 705 ILCS 405/2-21(5) (West 2016). In addition to the request to terminate parental rights under section 2-21(5), the court must make several findings before

_____

[4]The policy reasons for invoking this expedited termination include, but are not limited to, various aggravating circumstances, extreme cases of incapacity to parent, and when the parent's parental rights with respect to another child have been previously terminated. 705 ILCS 405/1-2(1) (West 2016); see also *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶¶ 61-62.

it may terminate those rights at the dispositional hearing: (1) the court must find by a preponderance of the evidence that the child is abused, neglected, or dependent; (2) the court must find by clear and convincing evidence that the parent is unfit; and (3) the court must determine that it is in the best interest of the child to terminate parental rights and appoint a legal guardian. 705 ILCS 405/2-21(5) (West 2016).

¶ 27    Here, the State invoked section 2-21(5) by including in its original and second amended neglect petitions a request to terminate respondent's parental rights and appoint DCFS as legal guardian with the power to consent to adoption. Accordingly, the proceedings took place under the umbrella of the initial dispositional hearing, even though the court heard the evidence in different stages.

¶ 28    The State alleged in its original and second amended petitions that respondent was unfit due to depravity (750 ILCS 50/1(D)(i) (West 2016)). While section 1(D)(i) of the Adoption Act outlines several circumstances that create a rebuttable presumption of depravity, the State did not rely on any such presumption. In the absence of a rebuttable presumption, the trial court must closely scrutinize the evidence of the respondent's character and credibility to determine depravity. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 22. Our supreme court has defined depravity as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Shanna W.*, 343 Ill. App. 3d 1155, 1166 (2003). The acts alleged must form a course of conduct of sufficient duration and repetition to establish a moral deficiency, along with an inability or unwillingness to conform to accepted morality. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 22; see also *In re Shanna W.*, 343 Ill App. 3d at 1166.

¶ 29                                    A. Unfitness Finding

¶ 30    We will not overturn a finding of unfitness unless the decision is against the manifest weight of the evidence. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 31    Here, the State presented what the court characterized as an "outpouring of evidence" supporting the allegation that respondent was depraved and therefore unfit. See 750 ILCS 50/1(D) (West 2016); *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. The trial court highlighted some of the evidence that it considered. It found that Angela had a "credible demeanor and was even quite fearful in her testimony." The court noted her testimony that respondent physically and verbally abused her on a daily basis for nearly a decade, fueled by his nearly 30-beers-per-day drinking habit. When she struggled to flee his abuse, he beat her to the point of unconsciousness and threatened to kill her if she tried to leave again. He also physically and emotionally abused their children. Respondent declared that he would "beat the special needs out" of E.B. He often locked E.B. in a room for hours at a time, with no access to food or water. He denigrated all three of the children for sitting in the wrong place or not bringing him a beer quickly enough. He sometimes pummeled E.B. and H.B. until they bled. This malevolent course of conduct toward the children began around 2005 and ended only when DCFS removed them from the home in 2013. For Angela, it ended a year later when respondent was incarcerated after a brutal physical attack on her and another of his daughters.

¶ 32    Respondent continued this course of conduct even after Angela and their children were removed from his life. On July 24, 2015, the State indicted respondent on felony battery

charges for violent acts against his blind paramour, Wendy. He punched and demeaned her and suffocated her to the point of unconsciousness. He was convicted and ordered to have no further contact with Wendy or her home and to abstain from using alcohol. Despite these orders, he was again arrested for domestic violence against Wendy at her home while he was intoxicated, and he admitted to these allegations in open court.

¶ 33    On August 12, 2017, Rockford police detained respondent after he apparently attempted suicide during another period of intoxication. It took the efforts of two police officers and two civilians, under dangerous conditions, to thwart respondent's attempt to jump into the Rock River.

¶ 34    The evidence also established that respondent had abused Mary. When Mary became pregnant with N.B., she had been diagnosed with an intellectual disability, bipolar disorder, borderline personality disorder, and PTSD. Mary told Robinson that respondent had sometimes "pimped her out" and left her to find her way home on her own. When he was arrested in 2017, respondent possessed Mary's Link card,[5] ID, and bus pass.

¶ 35    The State presented certified convictions demonstrating respondent's history of domestic violence. He violated multiple orders of protection and probation. Among other violations, he failed to remain free of drugs and alcohol and failed to complete substance abuse treatment or engage in domestic violence treatment.

¶ 36    As to N.B., the court found:

> "[A]s of March 13, 2018, [respondent] knew [N.B.] was here and was less than two months old but did not do services or visitation and violated probation and went to jail again. In the Court's estimation given the history outlined in the testimony the father certainly meets the definition of depravity in *Shanna* ***."

See *In re Shanna W.*, 343 Ill App. 3d at 1166.

¶ 37    Respondent argues that the State failed to prove depravity by clear and convincing evidence. He admits that there "was much evidence of domestic violence," but he incorrectly asserts that he has been violence-free since 2014. The evidence clearly showed, through respondent's admissions, that he violently attacked Wendy in 2015 and again in 2016. He served several periods of incarceration for probation violations and outstanding warrants in 2018, during the pendency of this case. There is voluminous unrebutted evidence that demonstrates respondent's depravity.

¶ 38    Respondent next asserts that he was engaged in services at the time of the court's ruling and that he and N.B. had developed a bond. The evidence showed that respondent reported that he was engaging in some, but not all, of DCFS's required services. But respondent offered no evidence to corroborate his contentions. Respondent offered no explanation as to why he had failed to complete services in the several years that had passed since DCFS removed his other children from his care. Meanwhile, respondent's incarceration and bedbug infestation severely limited his opportunities for visitation and, thus, N.B.'s opportunity to bond with respondent. Jackson testified that the limited contact prevented N.B. from developing a bond with respondent.

---

[5]An Illinois Link card operates like a debit card and is meant to be used by approved persons to access cash and food stamp benefits. See *Illinois Link Card*, Ill. Dep't of Human Servs., https://www.dhs.state.il.us/page.aspx?item=30371 (last visited Feb. 8, 2019) [https://perma.cc/98G8-5V9F].

¶ 39 Respondent's last argument regarding the unfitness finding is that he did not have as much time as other similarly situated parents to rehabilitate himself. We generously construe this argument as challenging the expedited nature of these proceedings. As previously discussed, section 2-21(5) of the Act permits a court to proceed in an expedited manner when the State requests termination in the original neglect petition. 705 ILCS 405/2-21(5) (West 2016). Moreover, section 1-2(1)(b) of the Act suggests that expedited termination is appropriate "when the parental rights of a parent with respect to another child of the parent have been involuntarily terminated." 705 ILCS 405/1-2(1)(b) (West 2016). Here, the State requested termination of parental rights in its original petition, and the evidence was clear that respondent's rights had been involuntarily terminated as to E.B. Thus, the trial court appropriately proceeded in an expedited manner, and it allotted respondent the appropriate statutory opportunity to demonstrate his ability and willingness to parent N.B.

¶ 40 Given the volume of credible and unrebutted evidence presented against respondent, the trial court's ruling that respondent was unfit due to depravity was not against the manifest weight of the evidence.

¶ 41 B. Best-Interest Determination

¶ 42 Respondent next argues that the State did not prove by a preponderance of the evidence that it was in N.B.'s best interest to terminate respondent's parental rights. Once a trial court has found a parent unfit, considerations regarding parental rights yield to the best interest of the child. *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 23. The court must consider a number of statutory factors in the context of the child's age and developmental needs, including physical safety and welfare, familial and community ties, and the least disruptive placement. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 43 Respondent argues that we should review for an abuse of discretion the decision that it was in N.B.'s best interest to terminate respondent's parental rights, citing *In re M.S.*, 302 Ill. App. 3d 998, 1003 (1999). We disagree. *In re M.S.* was decided during a period of uncertainty among the districts of the appellate court as to the standard of review of this determination. Compare *In re V.O.*, 284 Ill. App. 3d 686, 691 (1996) (determination of the children's best interest is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion), and *In re M.S.*, 302 Ill. App. 3d at 1003 ("the decision to terminate [an] individual's parental rights rests within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion"), with *In re G.L.*, 329 Ill. App. 3d 18, 25 (2002) (abuse-of-discretion and manifest-weight-of-the-evidence standards are both applied when reviewing a decision to terminate parental rights), and *In re Tiffany M.*, 353 Ill. App. 3d 883, 891-92 (2004) (discussing the confusion among the districts of the appellate court and applying the manifest-weight standard). Our supreme court took a step toward clarifying this matter in *In re Austin W.*, where it reviewed a best-interest determination under the manifest-weight standard. *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 28; see also *In re J.L.*, 236 Ill. 2d 329, 344 (2010) (trial court's finding that it was in the children's best interests to terminate parental rights was not against the manifest weight of the evidence). Consequently, we will not disturb a trial court's decision that terminates an individual's parental rights at the best-interest stage of a combined hearing under section 2-21(5) of the Act unless that decision is against the manifest weight of the evidence.

¶ 44 During the best-interest stage of the combined hearing here, the trial court took judicial notice of the neglect-and-unfitness proceedings. Jackson testified that N.B. would not be safe in respondent's care, citing respondent's history of substance abuse and violence and his failure to successfully complete any services. Jackson further testified that respondent's limited interaction with N.B. since his birth meant that N.B. "wasn't able to develop a relationship and bond with his father."

¶ 45 Regarding N.B.'s foster parent, Jackson testified that DCFS placed N.B. in her home within three days of his birth. N.B. developed bonds with his foster parent, her extended family, and the community, through her church. N.B. had special medical needs, and his foster parent properly attended to those needs and expressed a willingness to adopt N.B. Jackson testified that it would be in N.B.'s best interest to be adopted by her.

¶ 46 Respondent offered no evidence at the best-interest stage of the combined hearing.

¶ 47 The trial court found by a preponderance of the evidence that it was in N.B.'s best interest to terminate respondent's parental rights. It considered, *inter alia*, that N.B. was well cared for in his foster home and that his special medical needs were being met. He had developed bonds with his foster parent as well as her extended family and had community ties through her church. Respondent, on the other hand, had failed to complete any services to overcome his substance abuse and violence issues. He would not be in a position to have N.B. returned to him in the foreseeable future. The court's finding was consistent with the testimony and documentary evidence presented, and we cannot say that it was against the manifest weight of the evidence.

¶ 48                                    III. CONCLUSION

¶ 49 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 50 Affirmed.