2021 IL App (2d) 210446-U
No. 2-21-0446
Order filed December 7, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re D.A., Jr., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Stephenson County. |
| | ) | |
| | ) | No. 18-JA-17 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. D.A., Sr., | ) | David M. Olson, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the respondent was unfit and that it was in his child's best interest that his parental rights be terminated was not against the manifest weight of the evidence.

¶ 2    The respondent, D.A., Sr., appeals from the trial court's order terminating his parental rights to his minor son, D.A., Jr. (D.A.).  For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The respondent is the biological father of D.A., born February 7, 2015.  The parental rights of D.A.'s mother, B.D., are not at issue in this appeal.  The case was initiated following a June 17, 2018, incident in which B.D. left the minor at home without supervision for an unreasonable period

of time. At this time, the respondent was incarcerated. On July 16, 2018, the State filed a petition for adjudication of wardship alleging that D.A. was neglected on the basis that this incident demonstrated a disregard for D.A.'s mental or physical health, safety, or welfare. See 705 ILCS 405/2-3(1)(d) (West 2016)). The petition further alleged that D.A. was neglected on the basis that he was in an environment injurious to his welfare in that his mother had prior indicated reports for inadequate supervision of D.A. and his sister. See 705 ILCS 405/2-3(1)(b) (West 2016). The State also filed a petition for temporary shelter care. Following a hearing on the same date, the trial court entered an order placing D.A. in the temporary guardianship and custody of the Department of Children and Family Services (DCFS), with discretion to place D.A. with a responsible relative. D.A. was placed with a maternal cousin and her husband.

¶ 5     On January 22, 2019, the State filed an amended petition for an adjudication of wardship. The petition alleged that D.A. was a neglected minor on the basis that (1) B.D. left D.A. at home without supervision on June 17, 2018, without regard to his mental or physical health, safety, or welfare (705 ILCS 405/2-3(1)(d) (West 2016)); (2) B.D. left D.A. at home without supervision sometime between June and July 2018, without regard for his mental or physical health, safety, or welfare (705 ILCS 405/2-3(1)(d) (West 2016)); and (3) D.A. was in an environment injurious to his welfare in that B.D. left him at home unsupervised on multiple occasions and had a prior indicated DCFS investigation for inadequate supervision of D.A. and his siblings (705 ILCS 405/2-3(1)(b) (West 2016)).

¶ 6     The case was scheduled for an adjudicatory hearing on January 29, 2019. However, B.D. and the respondent stipulated that the first allegation constituted neglect and that the State could prove the allegations at trial. On January 29, 2019, the trial court entered an order setting forth the

stipulation, dismissing the remaining allegations, and reflecting the parties' agreement to engage in recommended services.

¶ 7     On March 19, 2019, the trial court held a dispositional hearing. Following the hearing, the trial court found that it was in the best interest of D.A. that he be adjudicated neglected and made a ward of the court, and that DCFS continue to maintain guardianship and custody of D.A. With respect to the respondent, the trial court found that he was unable to care for or protect D.A. because the respondent was in prison and would be in prison for a few more years. The respondent had not seen D.A. since his arrest in 2016. The trial court found that outside placement was necessary for the safety and protection of D.A. The trial court set the goal at return home within 12 months.

¶ 8     A permanency review hearing was held on September 17, 2019. The respondent was still incarcerated and had not been offered any services. He had not had contact with D.A. since 2016. B.D. had not engaged in services and had not visited D.A. The trial court noted that it was not opposed to D.A. making a visit to the respondent in prison. The trial court ordered DCFS to investigate potential services for the respondent while in prison. The trial court found that, under the circumstances, the respondent had made reasonable efforts. The trial court set the permanency goal at return home within 12 months.

¶ 9     The trial court held another permanency review hearing on December 17, 2019. Julie Auestad, D.A.'s case worker, testified that the respondent was still in prison with a potential release date of January 4, 2022. She had taken D.A. to visit the respondent in prison. It was a five hour drive each way, so it was a long day for D.A. The respondent asked D.A. a lot of questions and the two interacted well. Auestad testified that there was a shelf of toys in the visitation room and the toys intrigued D.A. more than interacting with the respondent. The respondent told Auestad

that he would like to have custody of D.A., but he realized that D.A. was being well taken care of in his current placement. B.D. had not had any contact with DCFS, had not performed any services, and had not visited D.A.

¶ 10   Following arguments, the trial court found that B.D. had not made reasonable efforts or progress toward the return home of D.A. The trial court found that, although the respondent had made reasonable efforts under the circumstances, there was not reasonable progress because the respondent was incarcerated. The trial court found that because B.D. had no interest in D.A.'s return home, and because the respondent would be incarcerated for another two years, return home was no longer a viable goal. The trial court found that it was in D.A.'s best interest to change the goal to substitute care pending termination of parental rights.

¶ 11   On January 6, 2020, the State filed a petition to terminate the parental rights of B.D. and the respondent. As to the respondent, the State alleged that the respondent was unfit because (1) he was incarcerated, had been incarcerated repeatedly due to criminal convictions, and that his repeated incarceration had prevented him from discharging his parental responsibilities for D.A. (750 ILCS 50/1(s) (West 2018)); and (2) he failed to make reasonable progress toward the return home of the minor during the nine-month period of March to December 2019 (750 ILCS 50/1(m)(ii) (West 2018)).

¶ 12   The fitness phase of the termination-of-parental-rights hearing was conducted on November 24, 2020, and January 5, 2021. Auestad testified that the respondent was still incarcerated. She had taken D.A. to visit the respondent in prison on one occasion. While D.A. knew he was "visiting his dad in prison," D.A. was not "exactly sure who that was." Although the respondent was allowed to make two phone calls a day in prison, he had only called D.A. on one occasion. She was with D.A. during that call. When the call ended, D.A. said he did not know

who he was talking to. The respondent had only sent two letters to D.A. since the time D.A. was placed in foster care. The respondent was unable to provide financial support due to his incarceration and had not sent any Christmas or birthday gifts to D.A. The respondent was cooperative and had completed an individual counseling session as requested by DCFS. DCFS requested that the respondent take a parenting class that was offered at the prison. The respondent said that he could not take the class until closer to his release date. The respondent had completed four college classes while incarcerated and had participated in a Narcotics Anonymous program. On cross-examination, Auestad acknowledged that it cost money to make phone calls in prison. She did not know if the respondent had available funds or if he had the foster parents' phone number.

¶ 13    The respondent testified that he was incarcerated when D.A. was born. He met D.A. for the first time in May 2015. He was arrested again on January 6, 2016. The respondent testified that his projected parole date was November 18, 2021.

¶ 14    Following argument, the trial court noted that the State agreed that it had not proved the respondent unfit based on the second count in the motion to terminate parental rights, namely, a failure to make reasonable progress toward the return of the child from March to December 2019. As to the first count, the trial court found that, except for a few months from May 2015 to January 2016, the respondent had been incarcerated for most of D.A.'s life. The respondent's incarceration had prevented him from discharging his parental responsibilities as to D.A. The trial court found that the respondent was unfit based on his repeated incarceration.

¶ 15    On April 6, 2021, the case proceeded to a best interest hearing. Auestad testified that D.A. had been living with his foster family since July 2016. He was returned to B.D. in mid-2018 but was taken back into DCFS custody three months later due to improper supervision. Since then,

B.D. had essentially abandoned D.A. D.A. had been living with his foster family since he was just over a year old. He was now six years old. D.A. viewed his foster parents as his mother and father. D.A.'s foster parents adopted D.A.'s younger sister. The foster parents would like to adopt D.A. All of D.A.'s needs are met in the foster family home. D.A. has his own room and many toys. D.A. told Auestad that he likes his foster home and feels safe there. The foster family had facilitated visits between D.A.'s older sister and younger brother, who are currently in other foster homes. Auestad had visited the foster family's home about once a month since she took over D.A.'s case in September 2019. D.A. became integrated into the foster family over time. The foster family was a very loving family. According to Auestad, D.A. believed that the foster family was his family and that the foster home was his home. This was the only home that D.A. remembered.

¶ 16    Auestad testified that D.A. had some behavior issues, but his foster parents worked closely with the school and the situation had improved. Auestad opined that if D.A.'s placement was changed, his behavior could again become an issue. D.A. was in the process of being tested for the gifted and talented program at his school.

¶ 17    Auestad also testified that, when the respondent is released from prison, the respondent would need to have stable employment and housing for at least six months before DCFS would consider changing D.A.'s placement. The respondent would have to complete services such as counseling and parenting classes. Auestad opined that the respondent had not maintained a meaningful role in D.A.'s life. Auestad acknowledged that, in February 2021, the respondent's sister went to the foster parents' home to drop off gifts for D.A. from the respondent. Auestad stated that she talked to the respondent on the phone about once a month and the respondent

appeared very interested in D.A. and how he was doing. Auestad believed that the foster parents were willing to supervise visits between D.A. and the respondent.

¶ 18    Venetta Mitchell testified that she was D.A.'s foster mother. She had cared for D.A. since he was one and she was there for his first word. She also has custody of D.A.'s younger sister, and the siblings are very close. D.A. is also very close to her three children. They all get along and are very loving toward each other. D.A. was thriving in her home and she and her husband would like to adopt him. D.A. knows that B.D. is his mother, so he calls Mitchell "TT," for auntie. D.A. calls Mitchell's husband "Dad." She intends to foster good relationships between D.A. and his biological parents. D.A.'s older sister, who is in the custody of her father, comes to stay with Mitchell about every other weekend. The children are able to be together and maintain a sibling relationship.

¶ 19    The respondent testified that he was grateful to Mitchell for taking care of D.A. However, he would like to have custody of D.A. when he is released from prison. He wants the chance to be a father to D.A. He would continue to allow D.A. to have a relationship with Mitchell and her children. If he had known D.A.'s phone number, he would have called him from prison. He did not remember ever receiving D.A.'s phone number. He had tried to write letters to D.A. When he is released from prison, he plans to move in with his mother, who lives in southern Illinois. His mother has a job lined up for him. He would complete his services in order to get custody of D.A.

¶ 20    The respondent further testified that he completed college courses while in prison. By the time he leaves prison, he will have earned as associate's degree in liberal arts. He completed a mental health evaluation in prison, but the evaluator did not recommend any further counseling. He had been trying to take a parenting class, but enrollment was based on one's discharge date, so he had not been able to take the class yet. The respondent said he was willing to complete whatever

services DCFS recommended so that he could gain custody of D.A. He has a support network to help him when he is released—his mother, sisters, brother, aunt, and grandmother. His mother and brother both have jobs lined up for him.

¶ 21    Mary Ellis-White testified that she was the respondent's mother. She lived in Virginia, Illinois, worked at Reynolds Consumer Products, and had been married for 10 years. She will be able to get the respondent a job at Reynolds when he is released from prison. It will be a well-paying job that would allow the respondent to take care of D.A. The plan is for the respondent to move in with her when he is released from prison. She had tried to contact D.A.'s foster family to arrange to see D.A., but she found it very difficult to get in touch with them. Her daughter brought some gifts to the foster family's house for D.A., but her daughter was not able to see D.A. while she was there.

¶ 22    In closing, the State argued that it was in D.A.'s best interest to be adopted by his foster family. D.A. was bonded with his foster family and had stability. Even after the respondent was released from prison, there would be a significant amount of time for the respondent to establish a relationship with D.A. and for DCFS to determine whether the respondent was capable of parenting him. Considering the nature and the length of D.A.'s relationship with his foster parents, it would jeopardize D.A.'s emotional and psychological well-being to change custody at that point in time. D.A. was thriving with his foster family and the respondent's rights had to yield to the best interest of D.A.

¶ 23    The respondent argued that it was in D.A.'s best interest to be raised by his biological father. For the few months the respondent was out of prison, he was with D.A. a significant amount of time and taking care of him. The respondent will have an associate's degree when he leaves prison and his release date had been moved up because of his good behavior. He has a place to

live when he is released and a job. His mother is willing to drive him to Freeport to establish a relationship with D.A. The respondent argued that it was his highest priority to be a father to his son. He had shown a reasonable degree of interest in D.A. and had done what he could, given his incarceration. The respondent requested that the trial court deny the petition to terminate his parental rights.

¶ 24   The guardian *ad litem* (GAL) acknowledged that the foster family had been caring for D.A. for six years and that it would be very difficult for them to eventually lose custody of D.A. The GAL argued, however, that foster parents are supposed to be a temporary stopgap to getting children back to their biological parents. The system should not be designed such that foster parents become legal parents in every single case. The GAL opined that it was in D.A.'s best interest to still have his biological father, the respondent, have a chance to prove that he can parent D.A. The GAL noted that the respondent was very young when he went to prison and had been in custody on a single offense. Because the respondent was due to be released from prison very soon, the GAL opined that it would not be detrimental to D.A. to have the case continued to find out whether the respondent was capable of regaining custody.

¶ 25   On May 20, 2021, the trial court entered a written order terminating the respondent's parental rights. The trial court noted that D.A. had been in the custody of his foster family since he was one and that, at the time of judgment, D.A. was six years old. The respondent had been incarcerated that entire time. The trial court acknowledged the profound love and interest that the respondent had for D.A. but noted that its sympathy for the respondent did not change the best interest analysis. The trial court noted that its analysis had "nothing to do with punishment, or further vilification of [the respondent] for crimes he committed in the past, and for which he had paid his price." Further, its decision had nothing to do with the emotional damage that would be

inflicted on the adults involved. But that, "[i]t [had] everything to do with an innocent and unwitting child, who doesn't have any bond with [the respondent], and a significant bond with the foster placement ***."

¶ 26 The trial court addressed the statutory best interest factors. The trial court found that the majority of the factors favored the termination of parental rights. The trial court noted that, at the time of judgment, D.A.'s physical safety and welfare was being provided by the foster parents. D.A. only knew his foster family and his identity revolved around his foster placement. As far as D.A. knew, his foster family was his family. His younger sister was in the same house and the foster parents were close blood relatives of D.A. D.A. did not have any ties to the respondent. The trial court found that D.A.'s sense of security and familiarity was with the foster family and that the foster family treated D.A. with love and commitment. The trial court believed that a disruption of these relationships would be damaging to D.A.'s emotional well-being. As to D.A.'s wishes, the trial court found that D.A. expressed an affinity for his current foster placement and did not appear to express any affinity for the respondent. As to D.A.'s community ties, the trial court noted those ties were entirely with the foster family. Further, the respondent made clear that, if he gained custody of D.A., he intended to move D.A. to southern Illinois, and thus away from the only community D.A. has ever known.

¶ 27 In addressing D.A.'s need for permanence and stability, the trial court responded to the GAL's argument that the respondent should have an opportunity to gain custody and that denying the petition to terminate parental rights would not be detrimental to D.A. because it would essentially maintain the status quo. The trial court found that a foster family is not strictly a "place holder" in every instance and further explained:

"That may have been true 3 years ago, but that is no longer the case here. Sometimes, the 'placeholder' becomes so important to the child, as opposed to the alternative, over a long period of time, that the 'placeholder' replaces the biological parents as the primary stakeholder in that capacity."

The trial court further noted that providing permanency is more than just maintaining the status quo. Rather, it also includes finalizing a child's position and eliminating potential future disruptions to the child's life. The trial court found that this factor favored termination of the respondent's parental rights. Finally, the trial court found the statutory factor addressing the nature and length of D.A.'s relationship with his foster family, and the effect that a change in placement would have on D.A.'s emotional and psychological well-being, was the essence of this case. The trial court noted that D.A. had been with his foster family since before he was one year old and had, except for short three-month period, remained there past his sixth birthday. The trial court found that disrupting D.A.'s placement would "have a catastrophic negative impact on the mental and emotional health and well-being" of D.A. and that "this [was] consideration 'number one' for the Court." The trial court concluded that the State had proven by a preponderance of the evidence that it was in D.A.'s best interest to terminate the parental rights of the respondent. Following the denial of his motion to reconsider, the respondent filed a timely notice of appeal.

¶ 28                                     II. ANALYSIS

¶ 29     On appeal, the respondent argues that the State failed to prove by a preponderance of the evidence that the termination of his parental rights was in D.A.'s best interest.

¶ 30     The Juvenile Court Act of 1987 (Act) sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq*. (West 2016). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set

forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). See 705 ILCS 405/2-29(2), (4) (West 2016); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2016); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). We will not disturb a trial court's findings with respect to parental unfitness or the child's best interest unless the findings are against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence " 'only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence.' " *Id.* ¶ 30 (quoting *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16).

¶ 31 The focus of the termination proceeding shifts to the child following a finding of unfitness. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 75. "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *Id.*

¶ 32 When making its best interest determination, the trial court must consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences

of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). "A court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004).

¶ 33    In the present case, the record shows that the trial court engaged in a thorough analysis of the best interest factors in determining that the termination of the respondent's parental rights was in the best interest of D.A. The evidence shows that the respondent was incarcerated when D.A. was born but was released from jail when D.A. was three months old. When D.A. was 11 months old, the respondent was reincarcerated and remained incarcerated throughout these proceedings. D.A. had only made one visit to the respondent in prison. After the caseworker had facilitated a phone call between the respondent and D.A., D.A. indicated that he did not know who he was talking to. D.A. had no established relationship with the respondent.

¶ 34    The evidence also demonstrates that D.A. had been cared for by the foster family for the majority of his life. The foster family had provided for all of D.A.'s needs and D.A. felt safe in their home. D.A. referred to his foster father as "Dad" and considered the foster home to be his home. D.A. was in foster care with a biological sibling, who has been adopted by the foster family. The foster family facilitated activities between D.A. and other biological siblings that were not in the foster family's care. In addition, D.A.'s foster parents indicated that they were willing to encourage a relationship between D.A. and his biological parents. In light of this evidence, we do not believe that the decision to terminate the respondent's parental rights was contrary to the manifest weight of the evidence.

¶ 35    The respondent addresses each statutory best interest factor and argues why it should not weigh in favor of termination of his parental rights. However, this court will not reweigh the

evidence anew on appeal. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. Moreover, the respondent's arguments are unpersuasive. With respect to many of the factors, the respondent argues that they should weigh against termination because D.A. is still young and the respondent will be able to provide things such as identity, community ties, sense of attachments, and permanence when he is released from prison. He further argues that since he will be released from prison soon, he should be given an opportunity to be a father to D.A. However, the issue here is not the respondent's right to maintain his legal relationship with D.A., rather it is the best interest of D.A. As noted above, it is well settled that a parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *D.T.*, 212 Ill. 2d at 364. The respondent had an opportunity to be a father when he was released from prison when D.A. was three months old. However, he was reincarcerated about six months later. During the respondent's incarceration, and for almost six years now, D.A. was cared for by the foster parents, they provided for all his needs, and he had bonded with the foster family. Therefore, we cannot say that the trial court's finding, that D.A.'s best interest, including his interest in permanence, would be best served by terminating the respondent's parental rights, was against the manifest weight of the evidence.

¶ 36    Finally, the respondent takes issue with the trial court's finding that removing D.A. from the foster family home "would have a catastrophic negative impact on the mental and emotional health and well-being" of D.A. The respondent argues that there is no support for this in the record. However, Auestad testified that a disruption in placement could lead to behavioral problems for D.A. Moreover, such a conclusion is not against the manifest weight of the evidence as the record shows that D.A. had been cared for by the foster parents for almost six years, had bonded with the foster family, was thriving in his foster placement, and had no significant relationship with the respondent.

¶ 37                                          III. CONCLUSION

¶ 38     For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 39     Affirmed.