NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220511-U

NO. 4-22-0511

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jersey County |
| Petitioner-Appellee, | ) | No. 19JA32 |
| v. | ) | |
| Vernell M., | ) | Honorable |
| Respondent-Appellant). | ) | Allison Lorton, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1       *Held:*   The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights because the trial court's fitness finding was not
against the manifest weight of the evidence.

¶ 2       Respondent, Vernell M., is the father of K.M. (born May 14, 2019). In May 2022,

the trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS

50/1(D) (West 2020)), and in June 2022, it determined that termination of respondent's parental

rights would be in K.M.'s best interest. Respondent appeals, arguing that the trial court's fitness

determination was against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Procedural History

¶ 5       In May 2019, the State filed a petition for adjudication of wardship, alleging,

among other things, that K.M. was neglected in that her environment was injurious to her welfare

because K.M. and her mother, Julianna M., tested positive for methamphetamine at K.M.'s birth. See 705 ILCS 405/2-3(1)(b) (West 2018). (Julianna is not involved in this appeal.) According to the petition, K.M.'s father was unknown. Four days after the petition was filed, the trial court conducted a shelter care hearing and placed temporary guardianship and custody of K.M. with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6            In June 2019, following a hearing, the trial court adjudicated K.M. neglected. In July 2019, the trial court conducted a dispositional hearing and found Julianna unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor. The court also made K.M. a ward of the court and placed custody and guardianship of K.M. with the guardianship administrator of DCFS. (We note that in the dispositional report, the existence of a putative father appears for the first time, without identifying the individual by name. However, later in July 2019, after the entry of the dispositional order, the trial court entered a written order for DNA testing of respondent to determine if he was the biological father of K.M. In September 2019, the results of DNA testing were filed with the trial court that showed respondent was indeed the biological father of K.M.)

¶ 7                    B. The Petition for Termination of Parental Rights

¶ 8            In October 2020, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) due to his (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to K.M.'s welfare, (2) having been "convicted of approximately [three] felonies *** and at least one of these convictions took place within five (5) years of this petition," (3) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within nine months after an adjudication of

neglect, and (4) failing to make reasonable progress toward the return of the child to the parent during the nine-month period from June 11, 2019, to March 11, 2020. See *id.* §§ 1(D)(b), (i)(7), (m)(i), (m)(ii).

¶ 9        In May 2022, the trial court conducted a hearing on the fitness portion of the termination proceedings. At the beginning of the hearing, the court, at the State's request and without objection, took judicial notice of all orders previously entered, including the adjudicatory and dispositional orders.

¶ 10                          1. *Lindsey Perdun*

¶ 11        Lindsey Perdun testified that she worked for DCFS and was the caseworker in this case since its beginning. Perdun stated that K.M. came into care "because the mother had methamphetamine in her system and [K.M.] also had it in her meconium when it was tested." Perdun testified that DCFS notified respondent in September 2019 that DNA testing confirmed he was K.M.'s father. Perdun then scheduled two appointments with respondent to (1) complete an assessment and (2) communicate the service plan to him, but respondent "no-showed both of those with me, *** so we never able to, *** get visits initiated, *** get the service get do an assessment on him so I could get the services into the service plan for him." In October 2019, respondent was arrested and placed in the custody of the county jail. (The July 2021 permanency hearing report states respondent was arrested for "four counts of manufacturing/delivery of cocaine within the vicinity of a school/park.")

¶ 12        In November 2019, Perdun met with respondent at the county jail and completed the integrated assessment. She then updated the service plan to require respondent to (1) complete substance abuse treatment, (2) complete parenting classes, and (3) attend visitations with K.M. Respondent was then transferred to custody of the Department of Corrections (DOC).

Regarding visits with K.M., Perdun stated the following.

> "He was in receiving in DOC up until *** he got went to DOC was *** some point in time between January and March of 2020 when he transferred from Madison County to the state. *** [A]nd then he was in receiving for about three months after that, so he wasn't eligible for visits with [K.M.] until then. Then Covid started and there were no visits, so he really didn't have any visits with [K.M.] while in prison."

¶ 13 Perdun testified that respondent completed parenting classes in December 2021 or January 2022. Also, respondent had completed a substance abuse evaluation in March 2022 but did not complete substance abuse treatment because he was "unsuccessfully discharged for not following up on the recommendations of that evaluation." Regarding visits with K.M. following respondent's release from prison in October 2021, Perdun stated "there's been a couple missed but for most part he's been to [the] majority of the visits."

¶ 14 While respondent was in prison, he completed the prison substance abuse treatment program. DCFS and DOC then made recommendations for respondent to "follow up with treatment once released." However, respondent did not do so after being released from prison.

¶ 15                          2. *Respondent*

¶ 16 Respondent testified that he was employed full-time. Respondent testified that he completed his first drug evaluation while in prison. Respondent testified that he was willing to continue and finish any drug treatment that was recommended.

¶ 17                          3. *The Trial Court's Decision*

¶ 18 At the conclusion of the evidence, the trial court found respondent "ha[d] not

- 4 -

made significant progress towards reunification with [K.M.] since [his] release from [DOC]." The court also entered a written order finding respondent unfit under section 1(D) of the Adoption Act for "failure to make reasonable progress toward the return of [K.M.]" The court noted that respondent (1) was informed in September 2019 that he was K.M.'s father, (2) completed an initial assessment while in the county jail, and (3) was transferred to the custody of DOC in January 2020. The court wrote that upon the filing of the petition to terminate parental rights in October 2020, the court "stayed" the petition as to respondent and ordered DCFS to tailor respondent's service plan to the resources available to him in DOC.

¶ 19         The trial court acknowledged that respondent completed (1) a drug treatment program while in custody of DOC and (2) parenting classes in January 2022. However, following his release from prison (in October 2021), respondent was directed to complete a substance abuse assessment and complete any recommended treatment. Although he completed the assessment, he did not complete recommended treatment. Respondent also missed five requested drug drops and attended only "occasional" in-person visits with K.M., having chosen to live several hours away with his fiancée.

¶ 20         In June 2022 the trial court conducted the best interest portion of the termination proceedings and found that termination of respondent's parental rights was in K.M.'s best interest. (We note that respondent does not challenge the court's best interest finding on appeal.)

¶ 21         This appeal followed.

¶ 22                                II. ANALYSIS

¶ 23         Respondent appeals, arguing that the trial court's fitness determination was against the manifest weight of the evidence. We disagree and affirm.

¶ 24         We first note that "[a] finding that any one allegation has been proven by clear

- 5 -

and convincing evidence is sufficient to sustain a parental unfitness finding on review." *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33, 195 N.E.3d 837. Accordingly, because we conclude that respondent failed to make reasonable progress towards K.M.'s return during the nine-month period of June 2019 to March 2020, we address only that ground for unfitness.

¶ 25                          A. The Applicable Law and the Standard of Review

¶ 26                              1. *The Standard of Review*

¶ 27          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 28                          2. *The Law Regarding Reasonable Progress*

¶ 29          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during *any* nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2020). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with

the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 30    Likewise, this court has defined "reasonable progress" as follows:

" 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36; *Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 51, 55-57.

¶ 31    B. This Case

¶ 32    In the present case, the trial court found respondent unfit for failing to make reasonable progress from June 2019 through March 2020. Respondent asserts that the trial court erred by considering evidence that occurred after that nine-month period—namely, the time after he was released from prison—when it determined respondent was unfit for failing to make reasonable progress. He further asserts that he made substantial progress towards the return of K.M. during and after incarceration. Accordingly, respondent argues the trial court's finding was against the manifest weight of the evidence. We disagree.

¶ 33 Although the trial court did discuss evidence from outside of the nine-month time period, it also considered evidence from within the nine-month period in making its decision. (We also note that respondent himself testified to matters outside the nine-month time period—namely, on direct examination by his own counsel, respondent discussed counseling and drug drops after he was released from prison.) The record demonstrates that in September 2019, Perdun informed respondent that based on a DNA test, he was K.M.'s biological father. Subsequently, Perdun made two appointments with respondent to discuss the terms of his service plan, but he did not attend either of those appointments. Then in October 2019, respondent was arrested and incarcerated. During that time, respondent did not have any visits with K.M. and did not complete parenting classes as required by his service plan until he was released from DOC, around December 2021.

¶ 34 We note that "[t]he mere fact of incarceration is not evidence of failure to make reasonable progress. [Citation.] Nevertheless, incarceration can impede progress toward the goal of reunification." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21, 83 N.E.3d 1196. "Time spent in prison is included in the nine-month period during which reasonable progress must be made." *Id.* We also emphasize that reasonable progress is an objective standard that requires "that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 35 The record is clear that as of March 2020, respondent was nowhere near the return of K.M. Respondent did not visit K.M. and had no relationship with the child. Although the COVID-19 pandemic may have contributed to respondent's failure to visit K.M., the Adoption

Act does not include exceptions for the pandemic. Further, respondent's imprisonment was a direct result of his actions, the fallout from which respondent is solely to blame. Because of his actions, respondent did not form a relationship with his child. Instead, when respondent had the opportunity to begin to be a father to K.M., he failed to attend the appointments with Perdun.

¶ 36 Moreover, the trial court expressed doubt that K.M. could be returned to respondent even after respondent's release from prison—in October 2021—let alone in the near future from March 2020. The trial court wrote in its order that respondent would have "to make undoubtedly incredible efforts to work on the relationship with his child and complete further services" after being released from DOC to have K.M. returned. We note that the court's consideration of respondent's progress after his release from prison afforded him additional opportunity to reunite with his child, and he squandered that opportunity by failing to complete recommended substance abuse treatment, missing drug drops, and visiting only occasionally with K.M.

¶ 37 Given these facts, we conclude that the trial court's fitness finding was not against the manifest weight of the evidence and affirm the court's judgment terminating respondent's parental rights.

¶ 38 III. CONCLUSION

¶ 39 For the reasons stated, we affirm the trial court's judgment.

¶ 40 Affirmed.