2022 IL App (2d) 210671-U
No. 2-21-0671
Order filed March 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.C., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 19-JA-554 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. D.H., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare was not against the manifest weight of the evidence. As such, and because respondent does not challenge the best-interest phase of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 2                                    I. BACKGROUND

¶ 3   Respondent is the biological grandmother and adopted mother of A.C., who was born on

May 13, 2016. Respondent's parental rights were terminated on October 20, 2021. A.C.'s adoptive

father's rights were also terminated in the same proceedings but are not at issue in this appeal.

Respondent appeals the trial court's decision to terminate her parental rights, arguing that the trial

court's unfitness findings on all three counts are against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 4                                        A. Neglect Petition and Shelter Care Proceedings

¶ 5      On December 26, 2019, the State filed a one-count neglect petition on behalf of three-year-old A.C., alleging that she was a neglected minor and her environment was injurious to her welfare because respondent has a substance-abuse problem which prevents her from properly parenting A.C., thereby placing A.C. at risk of harm. 705 ILCS 405/2-3(1)(b) (West 2018). A shelter care hearing was held the same day.

¶ 6      The shelter care report also filed on December 26, 2019, by the Department of Children and Family Services (DCFS) set forth the basis for the petition. The report indicated A.C.'s biological mother is respondent's daughter. Respondent and her husband were granted custody of A.C. on April 25, 2017, due to A.C.'s biological mother's drug abuse. Respondent and her husband adopted A.C. on June 18, 2019. The report stated that DCFS involvement in this case commenced in December 2019 when respondent tested positive for both cocaine and benzodiazepines while in the hospital being treated for injuries suffered after she fell in the shower. Respondent had been prescribed a medication that would result in a positive test for benzodiazepines. The report indicated that there was "an ongoing history of drug use and domestic violence," including three DCFS investigations in respondent's home in the past year and several police visits to the home. A.C. was placed with her maternal aunt.

¶ 7      Respondent waived her right to a shelter care hearing and agreed that there was probable cause of neglect, that there was an urgent and immediate necessity to remove the minor, and that reasonable efforts had been made by DCFS. Respondent agreed that DCFS would be granted temporary guardianship and custody of A.C. and visitation would be supervised and at the

discretion of DCFS. Respondent was ordered to cooperate with DCFS, to remain drug free, and to submit to random drug tests with less than 24-hours' notice. She was admonished that missed drug tests would be deemed positive. The court expected visitation to be "more liberal" in this case because A.C. was placed with a relative. Respondent was appointed counsel and Mary Cacciapaglia was appointed guardian *ad litem* (GAL).

¶ 8    An integrated assessment report was filed on March 9, 2020. The report revealed that respondent and her husband have been A.C.'s primary caregivers for most of her life and adopted her in June 2019. The report noted a history of domestic disturbances in respondent's home, including numerous calls to the police regarding domestic violence and drugs during the prior year. Respondent was reported to have "indicators of substance-use disorder," despite her denials of having a substance-abuse problem. She reported that she has been diagnosed with and prescribed medication for depression.  Respondent said that her testing positive for cocaine was a "fluke" because she only used the drug once and she did not believe there was anything she needed to change to improve safety or provide better care for A.C. The assessment revealed that reports have indicated that respondent's substance-abuse problem has escalated over time and there is great concern given she has been diagnosed with a mental-health condition and prescribed psychotropic medication, and there is potential for dangerous drug interactions. Recommended services included a substance-abuse assessment, random drug screening, individual therapy, psychotropic medication monitoring, and other services deemed necessary. Domestic-violence services were not required at the time. The prognosis for reunification was "guarded-poor" because respondent's problems seemed to be escalating due to substance abuse, respondent would not acknowledge that there were any problems, and it was unknown whether she would participate in any services within a reasonable amount of time.

¶ 9                                    B.  Adjudication and Disposition

¶ 10    The matter proceeded to an adjudicatory hearing on June 2, 2020. After conferring with counsel, respondent stipulated to the neglect petition. A.C. was adjudicated neglected, and the court admonished respondent to cooperate and make reasonable efforts and reasonable progress to cure the conditions that lead to the removal of the child.

¶ 11    At the dispositional hearing on July 15, 2020, the parties agreed to entry of a "standard dispositional order." The court found respondent unfit, unwilling, or unable to properly protect, train or discipline A.C. DCFS assumed guardianship of A.C. It was noted that A.C. was doing well in her current placement and she would remain there. The goal set was return to home. Respondent was admonished of her right to appeal as well as her obligation to cooperate and engage in any services deemed necessary by DCFS to meet the goal of reunification. The matter was set for status of services hearing on September 29, 2020.

¶ 12    At the status of services hearing, the court noted respondent remained on a waiting list for services due to delays associated with the Covid-19 pandemic. The Youth Service Bureau (YSB) report filed on September 24, 2020, indicated that respondent was still waiting to be assigned a counselor and to obtain a domestic-violence assessment. Respondent completed a substance-abuse assessment at Rosecrance and was found to not be in need of services at the time. However, respondent subsequently missed two drug tests. She had one clean drug test in July 2020, but it was taken two days after the scheduled test date. Respondent was told she was required to complete another substance-abuse assessment due to the missed tests. Respondent missed numerous scheduled visits with A.C. between July and September 2020, including two due to Covid-19 restrictions, four cancelled by respondent, one cancelled because respondent failed to confirm, and two cancelled due to quarantine requirements resulting from respondent traveling out of state to a

Covid-19 hotspot. The court noted the missed drug tests, reminded respondent that a missed test is presumed positive, and explained the importance of respondent consistently meeting this obligation.

¶ 13                                      C.  Permanency Reviews

¶ 14    The first permanency review hearing was held via Zoom on December 22, 2020, respondent was not present due to illness. The permanency review report filed with the court the day before showed that respondent had completed an initial substance-abuse assessment that resulted in a determination that no services were needed at that time. However, respondent had missed another drug test since the last court hearing and tested positive for cocaine on two other occasions. Respondent was required to sign the consents for a new substance-abuse assessment, but she failed to do so. The report indicated that respondent had not made herself available for a mental-health assessment. The December 2020 service plan required respondent to complete a domestic-violence assessment. However, respondent refused to complete the assessment, noting that after she had some "technology issues and after being walked through how to connect for the assessment she got on the phone and said she was tired of you people and hung up." Respondent receives social security disability income. She is behind on the rent for her home; she was given information about "the COVID-19 rental assistance program," but she did not apply for it. Regarding visitation, the report noted that respondent has two hours of weekly supervised visitation with A.C. Since the last court hearing, there had been seven visits scheduled. Respondent attended two of these visits but ended the visits early. The missed visits were reportedly due to illness, car trouble, and being out of town.

¶ 15    The State and GAL rested on the permanency review report which recommended a finding of no efforts or progress and a goal of return to the home in 12 months. The court adopted the

recommendations in the report, finding that DCFS had made reasonable efforts, that placement was necessary and appropriate, and that respondent had not made reasonable efforts or progress toward reunification.

¶ 16    The second permanency review hearing was held on March 16, 2021. The only evidence presented was a YSB status report which had been filed on March 11, 2021. The report revealed that respondent did not complete a domestic-violence assessment, so she was dropped from the program. Respondent was also dropped from counseling services for being dishonest about her drug use. During counseling, she denied having a positive drug test, but later she admitted to it during a family team meeting. She was allowed to continue mental-health services; however, she was subsequently dropped from the program when it was discovered that she asked someone to provide her a urine sample for a drug test scheduled for February 3, 2021. Regarding her drug tests, respondent tested positive for cocaine on November 4, 2020 (taking the test one day late). She did not appear for the test on December 29, 2020. Respondent had negative tests on January 6, 2021, and January 14, 2021 (taking this test one day late).  Respondent failed to complete a scheduled test on January 28, 2021. She failed to appear for her tests on February 3 and 12, 2021. Respondent was given new referrals to restart mental-health services and domestic-violence services, and she was placed on a waiting list to start those services. She still had not signed the consents for a new substance-abuse assessment. Respondent attended 2 of the 10 supervised visits scheduled with A.C. since the last court hearing, and she left both visits early. The report noted that the lack of visits made it difficult to assess respondent's ability to parent. The report recommended a finding that respondent made no efforts or progress, that A.C. remain in the custody and guardianship of DCFS, and that the goal be return to home in 12 months.

¶ 17    The State recommended that based upon respondent's lack of efforts and progress, the permanency goal be changed from return to home in 12 months to substitute care pending termination of parental rights. The GAL agreed with the State's recommendations, noting the numerous missed drug tests, respondent's failure to actively engage in any services, respondent's lack of cooperation with DCFS, and respondent's minimal visitation with A.C. Noting the short review period since the last court date and the fact that she had not had a positive drug test since the last court date, respondent asked that she be found to have made reasonable progress and efforts and the goal remain return to home in 12 months.

¶ 18    After reviewing the report, the court ruled that respondent had not made reasonable efforts or reasonable progress towards reunification. Finding the prognosis for reunification poor, the trial court changed the goal to substitute care pending termination of parental rights.

¶ 19                              D.  Termination Proceedings

¶ 20    On April 22, 2021, the State filed a three-count motion for termination of parental rights and power to consent to adoption, alleging respondent was unfit because she: (1) failed to maintain a reasonable degree of interest, concern or responsibility as to A.C.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failed to make reasonable efforts to correct the conditions that caused A.C. to be removed during a nine-month period after she was adjudicated a neglected or abused minor under section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) or dependent minor under section 2-4 of the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) failed to make reasonable progress toward the return of A.C. to her during a nine-month period after she was adjudicated a neglected or abused minor under section 2-4 of the Juvenile Court Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). The referenced time periods were June 17, 2020, to March 16,

2021, (count 2) and June 2, 2020, to March 1, 2021, (count 3). On May 3, 2021, respondent was arraigned, and the matter was continued.

¶ 21                                    1. Unfitness Hearing

¶ 22    The unfitness phase of the proceedings to terminate respondent's parental rights commenced on June 4, 2021.

¶ 23    The State's only witness was Lacey Wacker-Gray, the foster-care caseworker from YSB assigned to A.C., now five years old. Wacker-Gray testified that she is responsible for ensuring a minor's safety while in placement as well as working with parents on services toward reunification. She confirmed that she assisted in completing the integrated assessment in this case, including interviewing the parties and making recommendations for services for the parents. The integrated assessment and three service plans (plans from January, June, and December 2020) were admitted into evidence. Wacker-Gray testified that this case began when respondent tested positive for cocaine when she was brought to the hospital after falling in the shower. She testified that the YSB had difficulty contacting respondent during the course of this case. Respondent often did not show up for scheduled meetings, would not return phone calls, and did not confirm visits in a timely manner. Wacker-Gray estimated that respondent missed "over half of the appointments that were scheduled" with YSB. It was recommended that respondent attend weekly counseling, but she was discharged for being dishonest with her counselor and not fully engaging in counseling services. Wacker-Gray described the incident where it was discovered that respondent attempted to obtain urine from a family member to use for a random drug test. When confronted about this during a family team meeting held via telephone, respondent became angry and hung up the phone. Wacker-Gray stated that respondent was not honest during her initial substance-abuse assessment at Rosecrance which is why the facility reported that respondent did not need any services.

¶ 24    Regarding respondent's random drug tests, Wacker-Gray testified that of the approximately 10 random drug tests respondent was asked to complete, "there were very few that were complied with." Respondent would often take the tests two or three days after they were scheduled, and Wacker-Gray estimated that respondent ignored "over 75 percent" of them. Respondent tested positive on two of the random tests she did take. When she spoke with respondent about her drug use, respondent would say "she didn't have a drug problem and that it was just a one-time thing." Respondent was first told in October 2020 that she needed to complete a new substance-abuse assessment, but she never did so because respondent claimed that she "didn't have a drug problem." She was told again as recently as February 2021, but still failed to do so.

¶ 25    Wacker-Gray stated that respondent often missed visits without giving notice, and when she did attend a visit, she would often end it early. Wacker-Gray estimated that respondent had missed over half of the visits since the case was initiated. The missed visits were disruptive to A.C.'s schedule, causing A.C. frustration and some behavioral issues. Wacker-Gray testified that when she explained this to respondent, she did not have any response. At one point, the foster parents requested to stop being responsible for supervising visitation because it was causing problems in their home. Respondent would schedule visits and then not show up, or she would call "randomly and ask to come over when [the foster mother] was working or late at night." Thereafter, Wacker-Gray supervised some of the visits between A.C. and respondent. She stated that respondent would make efforts to engage with A.C. and one time she brought some age-appropriate clothes and toys. Wacker-Gray stated that respondent never progressed to unsupervised visits because she did not satisfactorily complete any required services.

¶ 26    Wacker-Gray testified that respondent's substance abuse and depression create concerns about her ability to safely parent A.C. She stated that respondent did not complete any of the services that were required of her in the integrated assessment and service plans. Respondent was given a referral to obtain a domestic-violence assessment; an appointment was made, but respondent missed the appointment. She gave no reason for missing it and never called to reschedule.

¶ 27    On cross-examination, Wacker-Gray testified that when she stated that respondent missed over half of the appointments with her office, these appointments were to discuss the service plan, sign consents, getting updated information, and just generally checking in with her. She explained that respondent was given another referral for a substance-abuse assessment after she had a positive drug test. Respondent was instructed to go to Rosecrance, but she did not sign the consents. She also testified that respondent was informed when A.C. had doctor appointments by the foster parents, but she never attended.

¶ 28    The State asked the court to take judicial notice of the temporary custody order dated December 26, 2019, the order of adjudication entered June 2, 2020, the order of disposition entered July 15, 2020, and the permanency review orders entered on December 20, 2020, and March 16, 2021. The State rested.

¶ 29    Respondent testified that she is the grandmother and adopted mother of A.C. She testified that since the last court date when the goal was changed to substitute care pending termination of parental rights, she has not had visitation with A.C. However, prior to that she visited A.C. "most of the time unless something came up" but that she did not believe that happened often because she wanted to see A.C. any time she could. She explained that the visits were missed due to car problems or the weather, but that she always called to notify when she would not be there.

Respondent testified that she completed a mental-health assessment. When asked if she participated in counseling she stated, "I believe I did fairly" and explained that it was difficult because it was over the phone and she "didn't feel like it was going anywhere." She stated that she did not stop going to counseling, rather she was dropped because the counselor stated that respondent was not being honest. When asked about her drug tests, she stated that she went to most of them. She explained there were several reasons why she missed tests, including, her husband being at work, transportation issues, and confusion regarding the schedule. When asked about the incident where she attempted to get a relative to provide a urine sample for one of her drug tests, she initially denied it during her testimony. She then explained "it was a silly reason on my part." She said she had asked a friend for some medication because she was having some pain. When she realized the medication she took was Norco, she became worried. That is when she did ask a relative for a urine sample, but she did not follow through with it. She denied ever talking to anyone about having another substance-abuse assessment completed. Respondent testified that after she was dropped from counseling, she made arrangements with her primary physician to begin counseling at "Ware Center" and has been participating in counseling on her own.

¶ 30     On cross-examination, respondent clarified that when she asked her friend for medication for pain, she did not know she was given a prescription medication. When questioned why she did not ask what it was before taking it, she said she did not know. Respondent did not recall whether the incident of her asking her relative for a urine sample occurred before or after her last positive drug test. However, she reiterated that she did not follow through with it. When asked if the reason she did not follow through was because the relative she asked to provide it told her she had been drunk the night before, she responded "You know what, I don't even recall that. I just know that –

I didn't even talk to her after that." Respondent admitted to being dishonest with her counselor. However, she denied ever refusing to allow her counselor or caseworker to visit her home.

¶ 31     Questioning continued by the GAL. Respondent clarified that she has been in counseling on her own for about a month and a half and she has been to four appointments.

¶ 32     On July 14, 2021, the trial court issued its decision, finding that the State met its burden of proof on all three counts of the motion for termination of parental rights. The court enumerated the recommended services in the March 2020 integrated assessment and found that respondent failed to successfully engage in counseling, noting that she was discharged for being untruthful. Although she completed one substance-abuse assessment with a determination of no services (which the court found to be "quite unusual" under the circumstances), she failed to complete a follow up substance-abuse assessment which was required because she subsequently missed numerous random drug tests and tested positive for cocaine on two occasions. The court noted respondent's sporadic visitation, respondent's unresponsiveness to DCFS on many occasions, and the fact that it was difficult to communicate with her. The court concluded that all three counts were proven by clear and convincing evidence.

¶ 33                         2.  Best Interest Hearing

¶ 34     The best interest hearing was held on October 6, 2021. The State presented the testimony of Wacker-Gray, respondent's husband, and the foster mother. Respondent did not present any evidence. At the close of proofs and after hearing argument of counsel, the court found that the State had proven by a preponderance of the evidence that it was in A.C.'s best interest to terminate respondent's parental rights. A written order reflecting this decision was entered on October 20, 2021, and this appeal followed.

¶ 35                              II. ANALYSIS

¶ 36    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 37    In this case, the trial court found respondent unfit on all three grounds alleged in the motion for termination of parental rights. It is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds.

¶ 38    Count 1 of the motion for termination of parental rights alleged that respondent was unfit pursuant to section 1(D)(b) of the Adoption Act. That section provides that a parent may be found unfit for "failure to maintain a reasonable degree of interest, concern or responsibility as to the

child's welfare." 750 ILCS 50/1(D)(b) (West 2020). In determining whether a parent has maintained a reasonable degree of interest, concern, or responsibility as to the child's welfare "courts consider the parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1064 (2006). Completion of service plan requirements may be considered evidence of a parent's interest, concern, or responsibility. *Daphnie E.,* 368 Ill. App. 3d at 1065. Similarly, noncompliance with an imposed service plan, repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b). *In re Jaron Z.,* 348 Ill App. 3d 239, 259 (2004). In making these determinations, courts focus on the parent's efforts which show interest in the child's wellbeing, not whether those efforts were successful. *Daphnie E.,* 368 Ill. App. 3d at 1065. Circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *Syck*, 138 Ill. 2d at 278-79. However, a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *Jaron Z.,* 348 Ill App. 3d at 259. Rather, the degree of interest, concern, and responsibility must be objectively reasonable. *Daphnie E.,* 368 Ill. App. 3d at 1064.

¶ 39    Respondent argues that the trial court's determination that she failed to maintain a reasonable degree of interest, concern, or responsibility as to A.C.'s welfare was not supported by the evidence. She argues that the court failed to consider that her "sporadic" visitation with A.C. was the result of her circumstances and need to cope with other aspects of her life circumstances and not due to any true indifference or lack of concern for A.C. In support, she notes that she missed visits due to illness, car trouble, and the fact that she had been traveling to Indiana due to

family issues. Respondent concludes that her "efforts show interest and concern for the minor, although at times she was not successful." We do not agree.

¶ 40    When given the opportunity to engage in visitation with A.C., respondent's participation reflects a lack of reasonable degree of interest, concern, or responsibility to A.C.'s welfare. Respondent missed numerous visits throughout the pendency of this case. Respondent testified that she participated in visitation "most of the time unless something came up." In fact, Wacker-Gray testified that respondent missed over half of the visits since the case was initiated and often it was without notice. According to the June 2020 service plan, the foster mother reported that she no longer wanted to supervise visits because too often respondent would cancel or just fail to show up. Respondent would also call the foster mother "randomly and ask to come over when [the foster mother] was working or late at night." Wacker-Gray testified that this was disruptive to both A.C. and the foster family's life, causing AC frustration and sometimes behavioral issues. When respondent was told about these concerns, she had no response. The March 2021 permanency review report indicated that the lack of visits made it difficult to assess respondent's ability to parent. Wacker-Gray observed a visit and noted that respondent did bring some clothes and toys and tried to engage with A.C. However, respondent never progressed to unsupervised visits because she did not satisfactorily complete any of the required services.

¶ 41    Further support for the trial court's determination that respondent lacked a reasonable degree of interest, concern, or responsibility for A.C.'s welfare is respondent's lack of cooperation with her caseworker. Wacker-Gray testified that she had difficulty communicating with respondent throughout the pendency of this case. She was assigned to this case in January 2020, but she was unable to make contact with respondent until February. Respondent would often not show up for scheduled meetings, return phone calls, or confirm visits in a timely manner. Respondent missed

over half of the scheduled appointments with her caseworker. These appointments were to discuss the service plans, sign consents to begin services, obtain updated information, and just generally check in with respondent about her progress. Respondent's lack of concern or interest in this case is further demonstrated by the fact that, according to the January and June 2020 service plans, she refused to let the caseworker visit her home or even provide her current address, though respondent said she resided in a rental home that was under construction. The December 2020 service plan indicated that respondent was no longer living in the rental home, but no new address was provided.

¶ 42 As previously stated, noncompliance with an imposed service plan and repeated failure to obtain treatment for an addiction have also been held to be sufficient evidence of a parent's failure to show reasonable degree of interest, concern, or responsibly for child's welfare. See *In re Jaron Z.,* 348 Ill App. 3d 239, 259 (2004). Respondent had numerous opportunities to comply with the service plan requirements to alleviate the concerns about her drug use and domestic violence in her home. The record reveals that she failed to do so.

¶ 43 Throughout this case, respondent has minimized the serious concerns regarding her drug use. This case came into care because of respondent testing positive for cocaine when she arrived at the hospital to be treated for injuries sustained after falling in the shower. Respondent has said that her use of cocaine was a "fluke" or a "one-time thing" and she has insisted that she does not have a substance-abuse problem. However, the integrated assessment reported that respondent has "indicators of substance-use disorder" and there were concerns that her substance-abuse problem was escalating. Respondent argues that the fact that her initial substance-abuse assessment resulted in no services being recommended shows her compliance "with the only task related to the rationale for the removal of the child." However, respondent ignores the substantial evidence that

her substance abuse continues to be a problem. Respondent was ordered to comply with random drug tests with 24-hours' notice. After that initial assessment, she missed numerous random drug tests (which were deemed positive), tested positive twice, and solicited a family member to provide a clean urine sample to use for a drug test. The timeframe surrounding her efforts to obtain that urine sample is notable. Respondent did not complete the January 28, 2021, test. She attempted to obtain a relative's urine for the February 3 test, and when that failed, she did not show for that test. She also did not show for the test on February 12. Respondent's contention that her cocaine use was a "fluke" or a "one-time thing" is inconsistent with her behavior and the evidence. Furthermore, she was dropped from counseling for lying to her counselor about her drug use. Respondent's refusal to seriously address the concerns regarding her own drug use and failure to comply with the service plans reveals lack of interest, concern, or responsibility for A.C.'s welfare.

¶ 44    Similarly, respondent's dismissal of DCFS's concerns about domestic violence in her home supports the court's finding of unfitness on count 1. Respondent repeatedly denied that there was any domestic violence in her house during the pendency of this case. However, the integrated assessment and all three service plans indicated there was a history of domestic disturbance in respondent's home, including numerous calls to the police regarding domestic violence and drugs during the prior year. The service plans required respondent to complete a domestic-violence assessment and follow any recommendations. Respondent was given a referral to obtain an assessment; but she failed to follow through with this obligation.

¶ 45    In sum, we cannot say that the trial court's determination that respondent was unfit as to count 1 because she failed to maintain a reasonable degree of interest, concern, or responsibility as to A.C.'s welfare was unreasonable, arbitrary or not based on the evidence. Having determined that the trial court's decision on this ground of unfitness is not contrary to the manifest weight of

the evidence, we need not consider whether respondent is also unfit on the other grounds found by the trial court. As such, and because respondent did not appeal the trial court's decision that it was in the minor's best interest that respondent's parental rights be terminated, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 46                                    III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 48    Affirmed.